LONSDALE COMPANY *et al. vs.* CITY OF WOONSOCKET *et al.*

PROVIDENCE—OCTOBER 30, 1903.

PRESENT: Stiness, C. J., Douglas and Blodgett, JJ.

(1) *Riparian Ownership.   Waters.   Diversion of Waters.   Municipal Corporations.*

The city of Woonsocket purchased a tract of land upon the banks of Crook Fall brook, a tributary of the Blackstone river, north of said river, and erected dams and reservoirs thereon.  Neither land nor brook was included within the corporate limits of the city.  The complainants, lower riparian proprietors upon the banks of the Blackstone river, claimed to be entitled to the unobstructed flow of the brook.  The respondent city claimed the right to divert so much of the water of the brook as should be necessary for a water supply for domestic, sanitary, fire and other purposes, by virtue of riparian ownership:—

*Held,* that a municipal corporation could not, from the mere fact of owning land upon a water course, acquire the right to divert the water in sufficient quantities to supply the domestic wants of its inhabitants to the injury of the other riparian proprietors.  The rights of the city as a riparian proprietor were limited to a reasonable use of the water, no greater or less than an individual proprietor would possess for his natural wants.

(2) *Continuing Trespass.  Account.  Interest.*

In the case of a continuing trespass, upon an accounting, it is improper to compound the interest annually.

(3) *Water Courses.  Diverting Water.  Riparian Ownership.*

In an action for the diversion of the water by an upper riparian proprietor, the burden of proof is upon the defendant to show the amount of water returned by him to the stream.   The initial taking is a trespass, and the water diverted must be returned at the defendant's peril, since the right to withdraw is not absolute, but contingent upon the water being returned.

(4) *Water Courses.  Storage of Water.  Riparian Ownership.*

In an action for the diversion of water by an upper riparian proprietor, the defendant is not entitled to any allowance for water stored by him in reservoirs during the rainy season, and subsequently released in the dry season when the supply of the stream was less.   Such storage is as to the lower proprietors a gratuity.

(5) *Continuing Trespass.  Account.  Presentation of Claims.*

In a bill in equity seeking relief by injunction for a continuing trespass, such ground of relief carries with it as an incident the right to an account for past damages, and chapter 36, section 12, General Laws, requiring the presentation of claims to the city council, has no application.

(6) *Damages.  Probable Damages.*

In a bill in equity seeking an injunction for the abatement of a continuing trespass, the decree sending the cause to a master directed him "to ascertain the probable damages of said complainants, since the filing of the bill of complaint, and for all probable future diversion of said waters;"—
*Held*, that the court would decline to consider any question as to damages accruing after the filing of the bill.

(7) *Account.  Interest.*

In a bill in equity seeking an injunction for the abatement of a continuing trespass for the diversion of the water of a stream, the finding of the master that interest should be allowed at the rate of six per cent. from the date of the filing of the bill is correct.

BILL IN EQUITY seeking an injunction for the abatement of a continuing trespass by an upper riparian proprietor in diverting the water of a stream.   Heard on exceptions to report of master.

BLODGETT, J.   This is a bill for an injunction and an accounting, and avers in substance that the complainants are riparian proprietors upon the banks of the Blackstone river,

and as such entitled to the unobstructed flow of Crook Fall brook and of its tributaries north of the river; and that the city of Woonsocket, by means of certain dams and reservoirs, has diverted a considerable portion of the natural flow of Crook Fall brook for the purpose of a water supply for its inhabitants.

The answer avers in substance that the city has a right to so divert the waters of this brook by reason of its riparian ownership above the complainants, although the brook is not within the city limits.

The case was sent to a master, who finds adversely to the respondents' claim of right to divert by reason of riparian ownership, and awards damages to the complainants in the sum of $187,795.97, and is now before the court on exceptions to his report.

The questions raised by the first three exceptions of the respondents are these:

" 1.   For that the master has decided and so reports that the complainants have the right to the natural flow of the Blackstone river, *undiminished.*

" 2.   For that the master has decided and so reports that the complainants have the right to the uninterrupted and natural flow of the Blackstone river.

" 3.   For that the master has decided and so reports that the unobstructed flow of the Crook Fall brook into the Blackstone river is a right belonging to the owners named as complainants."

These exceptions present at the very threshold of the inquiry certain questions as to the correlative rights of upper and lower riparian proprietors; and in view of the importance of the questions raised, we have thought it desirable to set forth at some length the decisions of other courts upon them.

It is conceded that the city of Woonsocket has purchased a tract of land upon the banks of Crook Fall brook, and has erected dams and reservoirs thereon, although neither land nor brook is included within the corporate limits of the city; and the city claims the right to divert so much of the water of the brook as shall be necessary for a water supply for domestic, sanitary, fire and other purposes, without accountability to the com-

plainants, by virtue of such riparian ownership. In support
of that contention counsel for the respondents cite the follow-
ing cases upon their brief:

"In *Ferrea* v. *Knipe*, 28 Cal. 343 (1865), the court says that
every owner on a water course has a right to a reasonable use
of the water in the same. . . . He may use it for water-
ing his cattle and such kind of indispensable purposes, *though
by so doing he has occasion to use so much as to prevent the
lower owner from enjoying it at all*, since his rights are sub-
ordinate to the reasonable use by the upper owner."

Upon this citation the only observation we have to make is
that the words quoted are not found in the opinion of the
court. On the contrary, the court says, p. 343: "Every pro-
prietor of lands through or adjoining which a water course
passes has a right to a reasonable use of the water; but he has
no right to so appropriate it as to unnecessarily diminish the
quantity in its natural flow." And see *Lux* v. *Haggin*, 69
Cal. (1886), 255; *Heilbron* v. *Canal Co.*, 75 Cal. (1888), 432.

The respondents aver that in *Tolle* v. *Correth*, 31 Tex. 362,
the court decides: "That if we apply all the water of a stream
to supply the thirst of people or cattle, or for household pur-
poses, those below them upon the same stream can make no
complaint for its loss." Upon this we remark that the exact
words used by the court are as follows:

"The question for adjudication is, whether a proprietor of a
tract of land in which originates a spring forming a stream,
running in a channel through his land and into the land of
another person, has a right to divert the stream from the nat-
ural channel, and cause it to overflow and irrigate the land,
provided the stream resumes its original channel before it en-
ters the land of the adjacent proprietor? . . .

"In the case of *Rhodes* v. *Whitehead*, 27 Tex. 310, Chief
Justice Moore, in delivering the opinion of the court, said: 'It
may be admitted that the purpose of irrigation is one of the
natural uses, such as a thirst of people and cattle and house-
hold purposes, which must absolutely be supplied; the appro-
priation of the water for this purpose would therefore afford
no ground of complaint by the lower proprietors if it were en-

tirely consumed.'" And then the court adds these significant words: . . . "We would not be understood as deciding to what extent a stream can be used for irrigating purposes. The relative rights or exclusive rights are not before us."

The citation from *Stein* v. *Burden*, 29 Ala. 132, appearing on the respondents' brief, contains indeed language to be found in the opinion of the court, but it does not support the respondents' contention, and omits all reference to the following language of the opinion, viz. (p. 134):

"A right to use of a stream being a part of the freehold interest, that right is co-existent with the right to the land over which it flows. Diversion of the water of the stream is an act continuous in its character; and each effluence of the water, resulting from the unauthorized act of another, is a wrong done to a proprietor below, if thereby the flow of the stream to him is materially diminished. . . . It is a continuing nusiance; and an action lies for the damages, *toties quoties.* . . . The maxim of the law is, *aqua currit, et debet currere ut solebat.* Each successive flow being a new wrong, a nuisance continued, imposes a corresponding cotemporaneous obligation to return such water to the channel of the stream.

"The argument then that a party who diverts water, and provides the means for its return, may then rest—that he may then continue to abstract large quantities of water, which water is not in fact restored to its accustomed channel, cannot be supported. It is no answer that the water would have continued to flow back into the stream, had not a stranger, by his unauthorized interference, rendered the means provided powerless to accomplish the object. He abstracts the water at his peril. His right to do so is not an absolute, but a qualified right. It only becomes a right when by restoration it ceases to work an injury to another. The diversion is *prima facie* a nuisance; and each continuance places the party under obligations to abate it. It is no defence, in such a case, that the author of the act was willing to apply the corrective, but was prevented. This rule, under the circumstances, is not a severe one. It only enjoins that the assumed right to abstract shall

be abandoned whenever the water cannot be returned.

"The argument against these views rests on the fallacy, which places the diversion of water among the absolute rights of parties. It is contingent; made absolute only so long as the diverted water flows back."

*Barre Water Co.* v. *Carnes et al.,* 65 Vt. 629, is a case more in point upon the respondents' contention. It rests in the main upon *Phila.* v. *Collins* (1871), 68 Pa. St., where, at p. 115, as it is stated on the respondents' brief, the Supreme Court of that State declares that "Every individual residing upon the banks of a stream has a right to the use of the water to drink and for the ordinary uses of domestic life; and where large bodies of people live upon the banks of a stream, as they do in large cities, the collective body of the citizens has the same right, but of course in a greatly exaggerated degree."

But an examination of *Phila.* v. *Collins* shows that the language quoted was not the language of the opinion of the court, but was the language used by the trial judge in the District Court in charging the jury, and that the findings in that case were sustained by a court composed of Thompson, C. J., and Agnew, Reed and Sharswood, JJ., Williams, J., at *nisi prius,* and that Reed, and Sharswood, JJ., dissented. This last case is claimed to be supported by *Mayor of Phila.* v. *Commissioners of Spring Garden* (1847), 7 Pa. St. 348; but further examination discloses that the court was speaking of navigable rivers, as appears in *Haupt's Appeal* (1889), 125 Pa. St. 224, where Chief Justice Paxson used the following language in referring to these two cases:

"In each of these instances the learned justice was speaking of a stream of water which is a public highway.

"To some extent the same principle may be applied to what may be called a private stream. In the case of a river or public highway all the people of the State have access to it; may ride over it, and use the water. Not so with a private stream. In such case no one can use it or take the water except at a public crossing. There the traveler may stop, refresh himself and water his horse; the water has no owner, and he impairs no man's right. But except at public crossings, such as a road

or a street, no one but a riparian owner can use the water; not because the latter has any ownership in it, but because the stranger has no right of access to it. It follows from what has been said that dwellers in towns and villages watered by a stream may use the water as well as the riparian owner, provided they have access to the stream by means of a public highway. The borough of Frackville, as before observed, is not a party to this proceeding; nor are the other *supra* riparian owners upon this stream. Their rights, therefore, cannot be determined now. We will not refer to them further than to say that whatever rights the inhabitants of Frackville, or the borough, as representing their collective rights, had to the use of the water of the little Mahenoy creek at the time the plaintiff constructed its dam, they have still. I do not say that the plaintiff may not impair those rights in the exercise of its power of eminent domain, but I do say that they cannot be taken, injured, or destroyed, without compensation being first made as provided by the constitution."

The recent case of *City of Canton* v. *Shock et al.* (1902), 63 N. E. Rep. 600, is also relied upon by the respondents as giving the sanction of the Supreme Court of Ohio to the proposition for which the respondents contend. The case is not identical with the case at bar, since there the stream in question which was diverted for water supply was within the city limits. But even so we think it is opposed to the better reason and to the weight of authority.

The respondents cite lastly in their behalf the following passages from *City of Auburn* v. *Union Water Co.*, 90 Me. 576: "Water for domestic use is a necessity. Water for use of mills is a convenience only; and there can be no conceivable reason why those who want it for domestic purposes should be compelled to buy it from those who want it for the use of mills. . . . And we hold that the right of the people to an abundant supply of pure water by which their health and cleanliness may be secured is paramount to the right of mill owners to have the water for propelling their machinery, and that to the extent that the two rights conflict the latter will yield."

These citations, upon a casual examination, would seem to be in support of the respondents' contention; but an examination of the case shows that the court here was speaking of those great ponds and lakes as to which, by the peculiar laws of the State of Maine, the title was held by the State. By adding the following citation to that already made, the question really at issue and really determined by the court will appear by the context, p. 507:

"We are not declaring or attempting to define the rights appertaining to wells, springs, rivulets, or small ponds. It is only of great ponds and lakes, the titles to which are held by the State for the use of the public, that we are now speaking. And of these great public ponds and lakes, we affirm that by the rules of the common law of this State, the people are entitled to a reasonable portion of their waters for domestic purposes without being obliged to buy it of the owners of mill privileges. And we affirm further, that, by virtue of the rule of property derived from the ordinance of 1641–7, as interpreted in this State as well as Massachusetts, the title to all great ponds,—that is, ponds containing more than ten acres,— is in the State, and that the legislature may confer upon towns and cities the right to take water from such ponds for domestic purposes without making such towns and cities liable for the losses thereby sustained by the owners of mill privileges. Health is of more importance than wealth, and cleanliness is next to godliness; *and we hold that the right of the people to an abundant supply of pure water, by which their health and cleanliness may be secured, is paramount to the right of mill owners to have the water for propelling their machinery; and that, to the extent that the two rights conflict, the latter must yield.* Of course private property cannot be taken for public use without making compensation for it. But the waters of great ponds and lakes are not private property. They are owned by the State, and the State may dispose of them as it thinks proper." And see the opinion of Mr. Justice Story in *Webb* v. *Portland Mfg. Co.*, 3 Sumner, 189.

The true rule governing the supply of water for municipalities in cases similar to the one at bar is, we think, aptly ex-

pressed by Mr. Justice David J. Brewer, when speaking for the Supreme Court of Kansas, in *City of Emporia* v. *Soden,* 25 Kan. at p. 606-7, where a similar contention was made, as follows:

"A second matter of defence is this: While the undiminished flow of the stream is conceded to be the right of every riparian owner, yet this right has always been limited to this extent, that each riparian owner may, without subjecting himself to liability to any lower riparian owner, use of the water whatever is needed for his own domestic purposes and the watering of his stock. The city is a riparian owner, and whether it uses little or much, it is simply taking for domestic purposes. Each individual citizen of Emporia may buy land on the banks of the river, and then take for domestic uses whatever amount of water he needs. What the individual separately may do, the city, representing all the individuals, has done. Does the manner in which the result was accomplished make any difference in the right?

(1)    "This argument is plausible but not sound. A city cannot be considered a riparian owner within the scope of the exception named. The amount of water which an individual living on the banks of a stream will use for domestic purposes, is comparatively trifling. Such use may be tolerated upon the principle of *de minimis non curat lex.* It is a use which must always be anticipated, and may reasonably be considered as one of the benefits of the ownership of the banks of a natural stream. Everyone proposing to utilize the power of running water should reasonably expect that the stream is chargeable with such a slight burden. It is only a fair equalization of rights. But the taking of water for the supply of a populous and growing city, stands upon an entirely different basis. No man can foresee this; and if it were tolerated, no one would dare to expend money in utilizing this power for fear of its being soon taken from him without compensation, and with total loss to his investment. The city, as a corporation, may own land on the banks, and thus in one sense be a riparian owner. But this does not make each citizen a riparian owner    And the corporation is not taking the water for its own domestic purposes;

it is not an individual; it has no natural wants; it is not taking for its own use, but to supply a multitude of individuals; it takes to sell.  Again, the statute under which the city is acting authorizes the taking of water 'for the purposes of supplying the inhabitants of such cities with water for domestic use, the extinguishment of fires, and for manufacturing and other purposes.  It would be strange if the city could destroy plaintiff's water power without compensation, and then sell it to other manufacturers, and thus build up rival establishments."  This opinion adopts and affirms *Stein* v. *Burden*, 24 Ala., where, at p. 146, the court says:

"It is insisted, however, that the fact that the city of Mobile owned land on the creek, upon the point where the mill of the defendant in error was located, gave to that corporation the right to the use of the water in sufficient quantities to supply the domestic purposes of its inhabitants.  That a riparian proprietor has the right to consume even the whole of the water of a stream, if absolutely necessary for the wants of himself and family, has received the sanction of judicial decision, but if this doctrine be correct it can have no application in the present instance, because it rests upon reasons which are wholly inapplicable to corporations, which are artificial bodies and can have no natural wants.  There are, however, other considerations which would forbid the extension of this rule to the case before us.  The city of Mobile is not located upon the creek; it is from three to five miles distant.  To hold that a municipal corporation can, from the mere fact of owning land upon a water course, acquire the right to divert the water in sufficient quantities to supply the domestic wants of its inhabitants, residing at a distance of from three to five miles, to the injury of the other proprietors, would be unreasonable in itself, and unjust to those who have an equal right to participate in the benefits of the stream. "

To the same effect also is the case of *Salem Flouring Mills Co.* v. *Lord*, decided in 1902, 69 Pac. Rep. 1039 (Sup. Ct. of Oregon):  "Riparian rights do not extend so far as to authorize the State to supply with water from the stream a sufficient amount to accommodate and meet the necessities of irri-

gation, cooking, laundry, sanitation, etc., for such institutions as the State penitentiary and the asylum for the insane, where from 1,300 to 1,500 persons are kept in constant confinement, the latter institution being located from a quarter to a third of a mile distant from the course of the stream. It is analogous to many cases to be found in the books, where individuals have claimed the right by reason of their riparian ownership to supply towns and cities with water, or where towns and cities adjacent to some part of a stream have claimed a sufficient quantity to supply the remote parts or portions thereof, but without avail. . . . The statement of the legal principle involved by the facts and conditions enumerated is, however, sufficient of itself to indicate its soundness, and we do not understand that it is seriously controverted." See also *Harding* v. *Stamford Water Co.*, 41 Conn. 87; *Ætna Mills* v. *Waltham*, 126 Mass. 422; *Ætna Mills* v. *Brookline*, 127 Mass. 69; *Sparks Mfg. Co.* v. *Newton* (1898), 57 N. J. Eq. 390; *Clark* v. *Pa. R. R. Co.*, 145 Pa. St. p. 449 (1891); *Strobel* v. *Kerr Salt Co.* (1900), 164 N. Y. 320, and the very recent case of *Crawford Co.* v. *Hathaway* (1903), 93 N. W. Rep. 781, where the doctrine of riparian proprietors' rights is discussed at great length by the Supreme Court of Nebraska.

We deem it sufficient to conclude our observations upon this branch of the inquiry in the language of Mr. Chief Justice Paxson, in *Lord* v. *Water Co.* (1890), 135 Pa. St. 130:

"The questions thus presented are not difficult of solution. By the purchase of this acre of land on which the spring is situate, the company acquired the rights of a riparian owner, neither more, nor less. What its rights as riparian owner are, were sufficiently defined in the recent case of *Haupt's Appeal*, 125 Pa. St. 211, where it was said: 'If the authority of the plaintiff were measured by its rights as riparian owner, it would be slender enough. It might indeed use the water for the domestic purposes incident to the said ten acres of land. If there was a tenant thereon he could use it for watering his stock, and for household purposes; for any useful, necessary and proper purpose incident to the land itself, and essential to its enjoyment. But that the rights of a riparian owner would

justify the plaintiff in carrying the water for miles out of its channel, to supply the borough of Ashland with water, is a proposition so palpably erroneous that it would be a waste of time to discuss it.' So we say here. The purchase of the acre of land, including the spring, gave the company the rights of a riparian owner. But such rights were not a justification for the diversion of the water from its natural channel to supply the city of Meadville.'

"It was conceded upon the argument that the company had the right to divert it under the power of eminent domain. But it has never exercised such right. To do so involves compensation to those who are or may be injured by such diversion. Compensation was not made, nor security tendered. While a city or borough, or a company having the right of eminent domain, may take a spring or stream of water to supply a municipality, it can only do so by making compensation to those who are deprived of the use of the water, as provided by the constitution. A taking without compensation is a trespass; as much so as the taking of land by a railroad company to construct its road without making compensation, or filing a bond with security, as provided by law. Where the power to take exists, it must be exercised according to law. If it is not, the corporation so taking becomes a trespasser, and may be proceeded against as such. It is a mistake to assume that the purchase of this acre of land gave the company an absolute right to the spring of water. The water did not pass by the deed beyond its reasonable use by the vendee as a riparian owner. As was said in *Haupt's Appeal, supra:* 'There can be no such thing as ownership in flowing water; the riparian owner may use it as it flows; he may dip it up, and become the owner by confining it in barrels or tanks, but, so long as it flows, it is as free to all as the light and the air.' The company might have taken this spring under its right of eminent domain, if it possessed such right; for aught that appears, it may do so still, and, after having done so and made compensation to the riparian owners who are injured thereby, it will be free from suits of this nature. Had it done so in this instance it would not have had this judgment against it."

The finding of the master upon this point is sustained, and the respondents' exceptions are therefore overruled.

The respondents' fourth exception is as to the amount of damages arising from the first filling of the large reservoir, No. 3, from October 14, 1895, to January 26, 1896, the capacity of said reservoir being 529,426,329 gallons. It appears from the undisputed testimony in the case that this reservoir was filled during the months when the rainfall was excessive, and it was contended on behalf of the respondents that this filling was practically simply a retaining of excess rainfalls, which otherwise would have gone to waste over the dams. But the master finds (p. 15), and the complainants' expert, Mr. Shedd, concedes (C. Q. 371, 372, p. 273), that only a portion of the water so impounded in the reservoir was available to the complainants, and we think that the city is chargeable only for the available amount actually diverted.

The respondents' exception in this respect and to this extent is sustained.

The fifth and sixth exceptions are to the amount of damages for diversion from 1893 to 1898, inclusive, on the ground that no allowance was made by the master for the return water from sewers and otherwise, because the cost per horse power used as a basis of computation is excessive; and also because the master has added interest each year compounded annually.

(2) We know of no authority for compounding interest annually in the case of a continuing trespass.

(3) It is claimed that this return is made first by means of a twelve-inch pipe through the lower dam from the working reservoir at the pumping station, which has been kept open at all times since the filling of No. 3 reservoir in 1895 and 1896, and that from this pipe a constant stream of water runs, delivering to Crook Fall brook, above the lands of these complainants, a stream varying from five hundred thousand to eight hundred thousand gallons per day.

The burden of proof is, of course, upon the respondents to show the amount so returned. The initial taking is a trespass, and the water diverted must be returned at the respondents' peril, since the respondents' first right to withdraw is not ab-

solute but is only contingent upon the water being returned.

We are not satisfied, upon the evidence, that the respondents have shown that this amount was returned. We are satisfied, however, that a less quantity, how much in amount we do not now say, has been so returned, and we think that the respondents are entitled to a proper allowance when the amount returned shall have been established by satisfactory proof.

It is also claimed, secondly, that water was returned by means of sewers. The testimony shows that the city owns a filtering plant, by means of which its sewage is filtered and the purified effluent is then returned to the stream. Obviously the exact method of determining the amount of water diverted would be to measure the amount pumped and then to measure the amount returned, both through the discharge pipe referred to and through sewers and otherwise, to the stream. While it may be impossible to do the latter with entire exactness, we do not think the master was justified in refusing to make any allowance whatever for the water so returned. Here, again, the burden is upon the respondents, but the master says that he has made no allowance for water so returned because only about one-fourth of the population is connected with sewers, and that the sewer system itself is far from complete, and that the evidence presented was not sufficient to enable him to compute the amount of water returned to the stream.

We are of the opinion that the city has shown that some allowance at least should have been made for water so returned. For example, it is undisputed by the respondents' Exhibit No. 16, sheet 1, that between 1893 and 1898 two public fountains in the city returned to the stream in all 16,889,120 gallons; and it also appears from the same exhibit that the water used for elevators in said city by certain persons within the same period, and all of which was returned to the stream, amounted to 44,-314,322 gallons; or a total returned, from these two sources, of 61,203,442 gallons. Taking the total average daily yield of Crook Fall brook water-shed at a little more than 8,400,000 gallons, the water so returned is equivalent to about seven days' supply of the whole volume of the brook. Assuredly, for water so returned the respondents are entitled to an allow-

ance, and they are likewise entitled to an allowance for such further amount of water so returned as it shall affirmatively establish by satisfactory evidence.

The respondents' exceptions in this respect are therefore sustained.

(4)     The seventh exception is: "For that the master has disallowed the claim of the respondents that the storing of surplus water in the reservoirs during the rainy season when it could not have been used by the complainants, and letting it go into the Blackstone river in the dry season when the supply from Crook Fall brook would have been imperceptible in power, was a benefit to the complainants and not an injury, and except to such disallowance."

This same question was considered in *Harding* v. *Stamford Water* Co. (1874), 41 Conn. at p. 93, and we think that the rule there stated should govern the case at bar, to wit: "The claim of the defendants that they have increased the capacity of this stream by making a reservoir of Trinity lake, which can be drawn from in the dry season, and so have made compensation for diverting the water, might be entitled to consideration if it appeared that the plaintiffs had the benefit of this increased capacity. The contrary in fact appears. The defendants accumulated this water for their own benefit, and draw it at their own pleasure to promote their own interests, and with no reference to the interests or wants of the plaintiffs. The plaintiffs have no control over it. It was indeed intimated in the argument that the plaintiffs had never applied for leave to draw from this reservoir, and the committee states that the single mill owner who had so applied was not refused. We cannot deem this to be of much importance. And to the suggestion that the plaintiffs have not asked for leave to draw this accumulated water, it might be sufficient to reply that the defendants have not offered to grant the plaintiffs the privilege of doing so. But a right which depends solely on the will of another, if indeed it can be called a right, is too unsubstantial to be estimated. Under a government of law, rights are defined by law, and rest on a firmer basis than human caprice."

The doctrine laid down in *Dyer* v. *Cranston Print Works,*

22 R. I. p. 515, is in accord with this view. The court there held that a reservoir established by an upper riparian proprietor for his proper and peculiar advantage was, as to lower proprietors, a gratuity. It follows that the resulting benefit to the latter cannot be the subject of compensation to the former, nor can it be the subject of set-off by him.

The finding of the master on this point is sustained, and the respondents take nothing by their exception.

The eighth exception is to the finding of the master that the court has passed upon the question of complainants' laches.

In the opinion heretofore delivered by the court in this case, December 22, 1899, reported in 21 R. I. 498, this question was decided. The court say: "We see no ground for the application of the doctrine of laches." The respondents' exception is accordingly overruled.

(5)     The ninth exception is to the finding that the notice of claims against the city of Woonsocket, filed April 7, 1897, was sufficient compliance with section 12, chapter 36, of the General Laws, requiring the presentation of claims to the city council before bringing the action.

To this contention it is sufficient to reply that the ground of equitable jurisdiction in this case is alleged to be a continuing trespass, and relief is sought by injunction, and that this ground of equitable relief carries with it as an incident the right to an account for past damages.

We are of the opinion that the statute has no application to the case at bar, and the respondents' exception thereto is overruled.

(6)     The tenth exception refers to the method of computing damages from the date of filing the bill, January 21, 1899, to the time of the conclusion of the taking of the testimony before the master in November, 1902. It is true that the decree of November 16, 1900, sending this case to the master, required him, amongst other things, to ascertain "the probable damages of said complainants and said estates, from the damage occasioned by said diversion, since the filing of the bill of complaint therein, and for all probable future diversion of said

waters;" and the master has therefore properly proceeded in accordance with the instructions of the decree. But this direction to the master is not founded upon any question hitherto adjudicated by the court. The bill seeks an injunction for the abatement of a continuing trespass, and it is not within the power of the court to say to these respondents that they may continue to trespass upon payment of a sum to be determined by the court. We assume that this direction was inserted in the decree in order, it may be, that the parties might ascertain the estimated value of the water so diverted as a basis of a possible settlement of the litigation. However that may be, we cannot rest our decree in this case upon any finding called for by such a direction, and for the purposes of this opinion we shall decline to consider any question arising as to damages accruing after the filing of the bill.

(7)     The eleventh exception presents two questions: First—what is the available horse power represented by the diversion and retention from 1893 to 1899; and second—what is the fair value per horse power in the way of compensation to the several complainants?

As to the first point, it is sufficient to say that from what has preceded it appears that the amount of water retained is not so great as the amount charged in the finding of the master.

And as to the second point, it is sufficient to say that we think that the finding of the master, as to the figures given by the complainants of the cost per horse power for such diversion during said period, is not sustained by the weight of evidence.

The respondents' exception is therefore sustained.

The twelfth exception is to the finding of the master that interest should be allowed at the rate of six per cent. from the date of the filing of the bill. Inasmuch as any damages awarded the complainants must be awarded as of the date of the filing of the bill, we are of the opinion that the master's finding in this respect is correct, and the respondents' exception is overruled.

The thirteenth exception refers to future damages and to

the finding of the master that the city of Woonsocket is to be treated as having taken the water of Crook Fall brook by condemnation.

Since these are not now before the court, the method of their computation requires no expression of opinion. It is not averred that past damages have been so computed.

All the remaining exceptions of the respondents and all of the complainants' exceptions relate either to future damages or to other questions already determined by the foregoing observations, and require no further discussion.

It follows from the foregoing that the court finds it to be established that the respondent city is unlawfully diverting the water of the complainants, and threatens to continue to do so, and that they are entitled to the remedy which they seek. This water has been taken without authority of law, and against the protest of the complainants, and without compensation. Legislation was passed, at the instance of the respondent city, authorizing it to proceed by condemnation to obtain a water supply for its inhabitants. The city has not seen fit to do this, but has chosen to follow the course which it has pursued.

In view of the fact that this is a matter of grave public concern, but in view also of the fact that these trespasses have been continued for many years, an injunction will issue as prayed by the complainants, unless within sixty days from this date they shall institute proceedings for the condemnation of the land and waters of the complainants needed for their water supply.

In the meanwhile the case will be recommitted to the master for the computation of damages accruing prior to the filing of the bill, and thereafter to the time of the condemnation of the lands of the complainants, if there be a condemnation, or to the issuing of the injunction, as the case may be, in accordance with the views expressed in this opinion.

*James M. Ripley and Henry W. Hayes,* for complainants.

*Stephen A. Cooke and Erwin J. France, City Solicitor of Woonsocket,* for respondents.