Vincent J. **MESOLELLA**

v.

**CITY OF PROVIDENCE et al.**

No. 83–510–Appeal.

Supreme Court of Rhode Island.

May 6, 1986.

Leonard Decof, Vincent T. Cannon, Decof & Grimm, Thomas L. Marcaccio, Jr., Marcaccio & Marcaccio, Providence, for plaintiff.

Robert G. Flanders, Jr., Edwards & Angell, Providence, Frank J. Mastrati, McDonald, Ferdinandi & Mastrati, Cranston, Gerard M. DeCelles, Abedon, Michaelson, Stanzler & Biene, Providence, for defendants.

OPINION

KELLEHER, Justice.

This is an appeal from a Superior Court judgment awarding damages and prejudgment interest to the plaintiff as a result of the illegal amendment of a zoning ordinance by the city of Providence. In an earlier opinion of this court, the amendment was found to be null and void for failure to comport with a "comprehensive plan."

The facts of this case, although set out in great detail in *Mesolella v. City of Providence*, 439 A.2d 1370 (R.I.1982), bear repeating in part as they relate to the issues at hand. On September 20, 1978, plaintiff, Vincent J. Mesolella (Mesolella), filed a complaint in Superior Court alleging that defendant city of Providence (city)[1] had amended the municipality's zoning ordinance in order to prevent him from building a federally subsidized, low-income family-housing project upon his two lots of land, which had previously been zoned suitable for multifamily residences. In his prayers for relief, Mesolella asked that the court (1) declare the amendment null and void, (2) order the building inspector to grant him a building permit, and (3) award him, in addition to his costs and disbursements, damages from the city in the sum of $2 million for "actual and as punitive damages for the intentional, malicious, arbitrary and capricious acts of the City of Providence in denying the plaintiff use of his land * * *." On December 13, 1978, the parties stipulated to the severance of the issues regarding the validity of the amendment and the issuance of the permit from Mesolella's claim for damages.

According to an agreed statement of facts submitted to the Superior Court, on July 18, 1968 Mesolella purchased lots No. 2 and 31 on assessor's plat 111, city of Providence, consisting of 115,164 square feet abutting Plainfield Street. He obtained total ownership in March 1970. At the time of its purchase, the property in question was zoned R–3. Mesolella and his son, associated in a venture known as Hillside Associates, planned to build forty-two units of section–8–assisted family housing in two buildings on the property. The proposed project was generally in compliance with the R–3 zoning in effect at the time of the purchase of the property. Plans and specifications for the project were filed with the building inspector in or about March of 1978, and an application for a building permit was submitted on May 8, 1978. On August 10, 1978, however, the city amended the zoning as it applied to Mesolella's property from R–3 to R–1, a classification that does not include multifamily housing, and a building permit never issued.

Minutes of a meeting of the Citizens of Neutaconkanut Hill, Silver Lakes Annex area, on March 3, 1978; transcripts of public hearings on the amendment conducted by the city council's ordinance committee on May 10 and June 12, 1978; and copies of the Journals of Proceedings of the City Council on July 6 and August 3, 1978, were part of the record considered by the court, in addition to the agreed statement of facts and the testimony of experts at trial.

In a judgment entered on February 9, 1979, the Superior Court justice declared the amendment null and void and ordered a building permit to issue, finding specifically that the amendment in question was passed directly to block Mesolella's project. This court affirmed that judgment on January 20, 1982, noting that implicit in the trial justice's finding that the amendment was passed to block the project was the finding that it was not enacted, as is required by G.L.1956 (1980 Reenactment) § 45–24–3, pursuant to a comprehensive plan. *Mesolella v. City of Providence*, 439 A.2d at 1375. The court directed that "the papers in [the] case [be] remanded to the Superior Court." *Id.*

---

1. The complaint also names the city treasurer, the building inspector, and the mayor as defendants. For the purposes of this opinion, we shall refer to them collectively as the city.

On motion by Mesolella, without objection by the city, the case was assigned to a special master for a determination of actual and compensatory damages, pursuant to Rule 53 of the Superior Court Rules of Civil Procedure.[2]

The special master held four hearings, on June 21, 22, 23, and 28, 1982, at which time Mesolella produced five witnesses and fourteen exhibits, and the city produced neither witnesses nor documentary evidence, relying instead on cross-examination. Based on testimony from the director of the Rhode Island Housing and Mortgage Financing Corporation (RIHMFC) and exhibits submitted by Mesolella, the special master found that prior to the amendment of the zoning ordinance Mesolella had submitted an application to RIHMFC for financing of the project, it had been approved by the corporation's board of commissioners, and a "feasibility letter," dated September 29, 1977, had been sent to Mesolella by RIHMFC's chief development officer.

Although the financing of the mortgage requested by Mesolella was to be furnished by RIHMFC, payment of the mortgage depended upon the availability of federal funds administered by the United States Department of Housing and Urban Development (HUD). Therefore, HUD also had to approve the plan. The special master found that such approval had been granted in a document entitled "Master Section–8 Annual Contribution Contract," which had been executed by Mesolella, the director of RIHMFC, and the authorized director of HUD, and returned to RIHMFC on February 23, 1978.

The master also found that Mesolella had reached an agreement with Continental Windgate Capital Corporation, a firm specializing in the syndication of real estate limited partnerships, dealing almost exclusively with section–8 subsidized housing, to syndicate the project. Both the treasurer of the syndicating company and Mesolella testified about the details of the agreement and the amount Mesolella was to receive out of the syndication.

The master further found that Mesolella's inability to obtain a building permit canceled the mortgage closing that would have completed the financing arrangements with RIHMFC. He noted that although the financing for the project was still in place when Mesolella's case on the merits was affirmed by the court in 1982,

> "drastic changes in the economy, including the federal government's decision to withhold further funding of Section 8 projects, the sharp increase in interest rates and construction costs as primary factors, plaintiff's proposed project was no longer feasible * * *.

> \*    \*    \*    \*    \*    \*

> "[D]uring the time period involved in the uncalled for litigation for which defendants were responsible, congressional closing down of Section 8 programs, together with prohibitive interest rates resulting from a steadily weakening economy, rendered the * * February 23, 1978 agreement [agreement for financing] useless." Report of Special Master 19, 21.

After a detailed analysis of the agreements referred to above and the testimony of the director of RIHMFC, his staff assistant, and the syndicating expert regarding the profits those agreements could reasonably have been expected to yield Mesolella, as well as testimony from experts in real estate and economics, the special master found Mesolella entitled to the following damages as a result of the city's "wrongful interference with the plaintiff's proposed development": (1) the syndication fee due Mesolella from the syndicator—$225,000; (2) equity in property if developed (market value)—$380,000; (3) expenses for development, planning, preparation—$16,960; and (4) return of equity on the property (reduced to present value)—$93,222.82.

---

**2.** Mesolella's claim for punitive damages was assigned to the Superior Court for determination. The record does not indicate the status of this claim.

On this basis, the special master recommended an award of $715,182.82 in damages, "with interest thereon to be assessed by the Clerk of the Court at the prevailing legal rate." A Superior Court justice granted Mesolella's motion to confirm the special master's report and adopted its findings.[3] Judgment was entered for Mesolella in the amount of $715,182.82 plus interest of $455,973.17.

In its appeal to this court, the city raises several issues, only three of which we find to have been raised below. It is well established in this jurisdiction that when an issue is not explicitly raised in the trial court, it is not properly before this court for review. *Scully v. Matarese*, 422 A.2d 740, 741 (R.I.1980). We therefore turn our attention to those questions properly before us, namely, whether the trial justice erred (1) in denying the city's motion to dismiss for Mesolella's failure to give the city notice of his claim in accordance with G.L. 1956 (1980 Reenactment) § 45-15-5; (2) in refusing to limit Mesolella's damages to $50,000 under the provisions of G.L.1956 (1969 Reenactment) § 9-31-3, as amended by P.L.1970, ch. 181, § 2; and (3) in confirming the special master's addition of prejudgment interest to the award of damages.

## I

The city argues that since Mesolella failed to present his claim against the city to the city council before filing suit, his claim for damages should be barred under the provisions of § 45-15-5.[4] The city acknowledges its failure to raise this defense until the end of the special master's hearing on damages, nearly four years after the commencement of the action. It contends, however, that under *Barroso v. Pepin*, 106 R.I. 502, 261 A.2d 277 (1970), failure to give notice as required by statute is a matter affecting the subject-matter jurisdiction of the court and that lack of subject-matter jurisdiction can, under Super. R.Civ.P. 12(h)(2), be raised at any time.

Mesolella contends that the city waived the defense of lack of notice under the provisions of Rule 9(c). We agree.

We have held, as the city maintains, that "the jurisdiction of [a] court depends upon strict compliance with the terms set out in the statute as a condition precedent to access to the courts for the relief contemplated." *Barroso v. Pepin*, 106 R.I. at 506, 261 A.2d at 279. In *Barroso* the defendant had raised the issue of failure to provide the notice required by statute in a "special plea in defense" in the lower court. This court equated that plea with a motion to dismiss for want of jurisdiction over the subject matter and upheld the trial court's granting of the plea. *Id.* at 503, 261 A.2d at 278.

██ We are of the opinion that the city in the case at hand, and the court in *Barroso*, confused the lack of jurisdiction over a particular action for failure to comply with the conditions precedent with a lack of jurisdiction over the class of cases to which that action belongs—blurring the distinction, as has often been done before, between the " 'appropriate exercise of power' " and the " 'absence of power.' " *La Petite Auberge, Inc. v. Rhode Island Commission for Human Rights*, 419 A.2d 274,

---

**3.** The city filed an objection to the motion to confirm, but it was not timely.

**4.** General Laws 1956 (1980 Reenactment) § 45-15-5 states:

"Every person who shall have any money due him from any town or city, or any claim or demand against any town or city, for any matter, cause or thing whatsoever, shall take the following method to obtain the same, to wit: Such person shall present to the town council of the town, or to the city council of the city, a particular account of his claim, debt, damages or demand, and how incurred or contracted; which being done, in case just and due satisfaction is not made him by the town or city treasurer of such town or city within forty (40) days after the presentment of such claim, debt, damages or demand aforesaid, such person may commence his action against such treasurer for the recovery of the same."

279 (R.I.1980); *Hartt v. Hartt*, 121 R.I. 220, 228–29, 397 A.2d 518, 523 (1979). The term "subject matter jurisdiction," when properly used, refers only to the court's power to hear and decide a case and not to whether a court having the power to adjudicate should exercise that power. *George v. Infantolino*, 446 A.2d 757, 759 (R.I. 1982).

The Superior Court clearly had the power to adjudicate in this case. As noted in *La Petite Auberge, Inc.*, "the Superior Court is a court of general equitable jurisdiction * * *; although its jurisdiction is not limitless, the Superior Court possesses, as a matter of fundamental judicial power, the jurisdiction to hear and confront the merits of any case wherein the power of determination has not been specifically conferred upon another tribunal." *La Petite Auberge, Inc.*, 419 A.2d at 279. The jurisdiction of a court in equity to assist those who are injured or substantially threatened with injury by the enforcement of an allegedly illegal amendment to a zoning ordinance is undisputed. *Mesolella*, 439 A.2d at 1373 n.1; *Town and Country Mobile Homes, Inc. v. Zoning Board of Review of Pawtucket*, 91 R.I. 464, 165 A.2d 510 (1960).

The challenge being made here is, therefore, to the appropriateness of the court's exercise of its power and not, as is indicated in *Barroso*, to its jurisdiction over the subject matter. Consequently, Rule 12(h)(2) does not apply.

In this case, the city's challenge to the court's exercise of its power is based upon Mesolella's failure to give it the notice required by § 45–15–5. The notice requirement contained in § 45–15–5 is a condition precedent to filing suit against the city treasurer. *See Whalen v. Bates*, 19 R.I. 274, 276, 33 A. 224, 224 (1895), as to the predecessor of § 45–15–5. According to Rule 9(c), "[a] denial of performance [of a condition precedent] shall be made specifi-

cally and with particularity." Failure so to plead constitutes a waiver of the defense. *Marcotte v. Harrison*, 443 A.2d 1225, 1230 (R.I.1982).

We are aware of our recent holding to the effect that when a plaintiff fails to allege the performance of conditions precedent to establish a defendant's liability, matters normally put into dispute by a specific denial do not have to be raised as affirmative defenses in order to be preserved. *Dixon v. American Re-Insurance Co.*, 477 A.2d 85, 88 (R.I.1984). In such a case, we continued, "the defendant is permitted to 'present evidence at trial of the nonoccurrence of the conditions [precedent] since the defense of failure to state a claim upon which relief can be granted may be shown at any time.' " *Id.*

We note that in *Dixon* the question was one of the specificity of the denial and whether the defendant should be allowed to amend his answer, not the total absence of denial, as it is in this case. Furthermore, there were no general or specific allegations by the plaintiff of performance of conditions precedent in *Dixon*. Although Mesolella did not specifically allege compliance with the notice provisions of the statute, he did allege that he "notified the City Council * * * at its deliberations that said ordinance was illegal, null and void, and would damage the Plaintiff."

Additionally, no "evidence" was offered in this case affirmatively to show the truth of the city's allegations of lack of notice. The city never raised the issue until it made its motion to dismiss at the end of the master's hearings—after filing its answer, after stipulating to the severance of the damage issue from the equitable issues, after stipulating to an agreed statement of facts that listed the costs incurred by Mesolella,[5] after trial and appeal on the equitable issues, after the motion assigning the case to the master to determine dam-

---

5. Although the city specifically noted that this information was furnished as agreed facts only insofar as it related to Mesolella's activity incidental to his plans, and not to any question of

damages, the inclusion of this list implies an awareness on the part of the city of the potential damage claim against it at an early stage in the proceedings.

ages (to which the city did not object), and after four days of detailed hearings on damages.

Given these circumstances, and the additional facts that the city council was the direct perpetrator of the alleged wrong in this case; had been told directly by Mesolella at its hearings that the proposed amendment was illegal, would cause him damage, and that he would sue if it were enacted—and thus had, in effect, actual notice of the pending litigation and ample time to attempt to settle the claim, the purpose of the notice requirement, *Burdick v. Richmond*, 16 R.I. 502, 504, 17 A. 917, 918 (1889); we conclude that the city conceded that Mesolella's claim in damages was cognizable. The city should not be allowed to invite error in this way and then take advantage of it at such a late stage in the proceedings. We therefore hold that the city waived the defense of lack of notice under Rule 9(c).

## II

The city contends that Mesolella's damages should be limited to $50,000, the statutory limit upon liability contained in chapter 31 of title 9 which abrogated the sovereign immunity of the state and its cities and towns in all tort actions.[6] The city raised this issue in the form of a motion before the special master, which was denied, and raised it again before the trial court.

After a detailed analysis of the history of sovereign immunity and its abrogation, the special master held, and the trial justice concurred, that § 9-31-1 only applies to actions that, prior to the adoption of the Superior Court Rules of Civil Procedure, could have been prosecuted under the common-law action for trespass on the case for negligence. Thus, the trial justice and the master concluded, the limitation in § 9-31-3 does not apply to the case at hand, an action in equity. Mesolella agrees, characterizing his damage claim as "incidental" to his pursuit of equitable and declaratory relief and thus not subject to the statutory limitation for tort. He relies on *Lonsdale Co. v. City of Woonsocket*, 25 R.I. 428, 56 A. 448 (1903), for support.

■ We first question the master's restriction of the statute to actions that could have been brought as trespass on the case in negligence.[7] It is true, as the master maintains, that *Kelley v. Cook*, 21 R.I. 29, 41 A. 571 (1898), which first applied the principle of a municipality's immunity from liability for the tortious conduct of its servants in the performance of a governmen-

---

6. According to G.L.1956 (1969 Reenactment) § 9-31-1, as amended by P.L.1970, ch. 181, § 2,
   "[t]he state of Rhode Island and any political subdivision thereof, including all cities and towns, shall * * * hereby be liable in all actions of tort in the same manner as a private individual or corporation, provided however, that any recovery in any such action shall not exceed the monetary limitations thereof set forth in the chapter."
   Section 9-31-3, as amended by P.L.1970, ch. 181, § 2, provides,
   "In any tort action against any city or town any damages recovered therein shall not exceed the sum of fifty thousand ($50,000) dollars; provided however, that in all instances in which said city or town was engaged in a proprietary function in the commission of such tort, the limitation of damages set forth in this section shall not apply."
   The limit upon liability has recently been raised to $100,000. Public Laws 1984, ch. 87, § 1.

7. The distinction between the common-law actions of trespass and trespass on the case is murky. "Trespass" was originally the remedy for all "forcible, direct, and immediate injuries" to persons or property, and "case" was designed to afford a remedy for wrongful conduct resulting in injuries that were not forcible or direct. Prosser and Keeton, *The Law of Torts*, § 6 at 29 (5th ed. 1984). Thus, case was the proper form of action for injuries that were consequential in nature. *Vogel v. McAuliffe*, 18 R.I. 791, 792, 31 A. 1, 2 (1895).
   Later, case came to be used in actions of negligence, and trespass, for intentional wrongs. Prosser and Keeton, *The Law of Torts* at 30. *See Randall v. Holmes*, 69 R.I. 41, 44, 31 A.2d 17, 19 (1943) (where injury is effect of force, direct and intentional, action for damages must be in trespass, not on the case). Given these distinctions, it is difficult to determine into which category the present action would fall.

tal function, and *Becker v. Beaudoin*, 106 R.I. 562, 261 A.2d 896 (1970), which, with some exceptions, judicially abrogated such immunity, were actions in negligence.

However, § 9–31–1, enacted in response to *Becker*, clearly and unambiguously holds a state or municipality "liable in all actions of tort in the same manner as a private individual or corporation," manifesting, as we have held, "by 'overwhelming implication,' a legislative intent to place the state [or municipality] in the same position as any other private litigant * * *." *Laird v. Chrysler Corp.*, 460 A.2d 425, 430 (R.I.1983). The statute goes beyond the holding in *Becker* in its abrogation of state in addition to municipal immunity; it similarly goes beyond the facts in *Becker* to include liability for *all* torts, not just those that could have been brought in "case." Admittedly, we have judicially limited the application of § 9–31–1 in our previous holding in *Calhoun v. City of Providence*, 120 R.I. 619, 629–30, 390 A.2d 350, 356 (1978) (§ 9–31–1 not meant to apply to all governmental functions; line of demarcation drawn with respect to judicial, prosecutorial, and legislative immunities), and *Ryan v. State Department of Transportation*, 420 A.2d 841, 843 (R.I.1980) (plaintiff must show that there was a breach of duty owed to him or her in an individual capacity and not merely a breach of some obligation owed to the general public). However, the first limitation was found to be in accord with that in the majority of jurisdictions in which sovereign immunity has been abrogated, *Calhoun*, 120 R.I. at 630, 390 A.2d at 355–56; the second limitation is traditionally imposed upon private litigants and thus comports with the statute. We find no similar basis for the special master's

8. According to Restatement (Second) *Torts*, § 158 at 277 (1965), to be liable for trespass to property, one must enter the land in the possession of another or cause something to do so, remain on the land, or fail to remove from the land a thing that he is under a duty to remove. A "continuing trespass" is defined as "[a]n unprivileged remaining on land in another's possession * * *." *Id.* at 280.

restriction upon the statute's applicability to actions in "case."

As to the inapplicability of § 9–31–1 to this, an action in equity, we note initially that it is well settled that a plaintiff may join equitable and legal claims in one action. Super.R.Civ.P. 8(e)(2), 18(a). Therefore, an action in which such claims are joined cannot be categorized purely as an action "in equity." Furthermore, we find Mesolella's reliance on *Lonsdale Co. v. City of Woonsocket* misplaced.

In *Lonsdale Co.* this court stated that when the ground for equitable relief is a "continuing trespass," it "carries with it as an incident the right to an account for past damages." 25 R.I. at 443, 56 A. at 454. *See also Wolfe v. City of Providence*, 77 R.I. 192, 201, 74 A.2d 843, 848 (1950). However, the ground for relief in the case at bar does not constitute a continuing trespass of the type presented in *Lonsdale* and *Wolfe*. Both *Lonsdale* (injunction sought by riparian landowners against city's diversion of water from a tributary of the Blackstone River) and *Wolfe* (injunction sought by abutting landowners against city's closing of a street in which they had a property right to vehicular traffic) involved a direct physical invasion of the property in question by the municipalities.[8]

In this controversy Mesolella was granted relief because an amendment was not passed pursuant to the city's comprehensive plan as required by statute. *Mesolella v. City of Providence*, 439 A.2d at 1375. Although Mesolella alleged that the amendment put an unreasonable restriction upon his property, such grounds do not, in the strict sense, constitute a continuing trespass. The holdings of *Lonsdale* and *Wolfe* are thus inapposite to this case.

We also note that at common law, an action in trespass required no proof of actual damages since the direct invasion of the plaintiff's rights was regarded as a tort in itself. Prosser and Keeton, *The Law of Torts*, § 13 at 75. Perhaps this was the source of the conclusion in *Lonsdale* that damages are incidental to such an action.

Far from being "incidental" to equitable actions like the present one, awards of money damages for wrongful denial of land-use permission are still relatively rare. Rathkopf, *The Law of Zoning and Planning,* § 46.01, 46–5 (1986). Actions seeking such damages have been based either on a tort theory of compensation for wrongfully inflicted injury, on a theory of inverse condemnation, or on a theory allowing damages for a "temporary taking" during the time that the land use has been restrained. *Id.* at 46–4.

■ The theories of "inverse condemnation" and "temporary taking" are based on the constitutional right to compensation in the law of eminent domain found in the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 16, of the Rhode Island Constitution. *See San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981); *Annicelli v. Town of South Kingstown,* 463 A.2d 133 (R.I.1983). Although Mesolella's complaint broadly charges the city with "violation of [his] civil rights * * * in violation of the State of Rhode Island and United States of America Constitutions," the particular constitutional provisions allegedly violated are not cited and the contention was not pursued throughout the litigation, nor were the earlier findings of the invalidity of the amended ordinance based specifically upon such considerations. We have consistently held that constitutional questions must be presented in specific form " 'stating separately each specific article, section and clause in the federal or State Constitution that is alleged to have been violated' " to

merit initial consideration by a trial court or later consideration by this court. *Town of Foster v. Lamphere,* 117 R.I. 541, 545, 368 A.2d 1238, 1240 (1977). Thus, we cannot consider Mesolella's prayer for damages to have been based on either of these two theories.

Although it is not so characterized by Mesolella, we find the action for damages in the instant case to sound in tort, in particular, the tort of interference with prospective contractual relations.[9]

We have previously recognized the existence of this tort in *Federal Auto Body Works, Inc. v. Aetna Casualty & Surety Co.,* 447 A.2d 377 (R.I.1982). There we noted that according to Restatement (Second) *Torts,* § 766 B at 20 (1979),

" '[o]ne who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.' " 447 A.2d at 380 n. 4.

■ The particular elements of the tort include (1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff. *See* Annot., 5 A.L.R.4th 9, 16 (1981). Malice, in the sense of spite or ill

9. This tort is known by different names in different jurisdictions, for example, interference with prospective economic advantage, inducing refusal to deal, interference with reasonable expectancy or business relations. *See* Annot., 5 A.L.R.4th 9, 16 (1981).

The tort has been used as a basis for seeking recovery in circumstances similar to those presented here. *See City of Rock Falls v. Chicago Title and Trust Co.,* 13 Ill.App.3d 359, 300 N.E.2d 331 (1973) (counterclaim that city, through mayor's acts, deliberately, willfully, and

maliciously pursued a course of conduct that prevented owner from obtaining business advantages he should have derived from ownership of premises stated cause of action for tortious interference); *King v. Seattle,* 84 Wash. 2d 239, 525 P.2d 228 (1974) (claim against city for arbitrarily withholding land-use permits characterized by court as tortious interference, but no recovery allowed because city's action in withholding permits found not to be proximate cause of plaintiff's damage).

will, is not required; rather legal malice—an intent to do harm without justification—will suffice. The burden is on the defendant to show justification. *Id.*

These elements are identical to those required to state a claim based on tortious interference with contractual relations, except for the requirement in the latter that an actual contract exist. *See Smith Development Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 211, 308 A.2d 477, 482 (1973).

■ We find these elements to have been pled and proved in this action. Mesolella's complaint alleged (1) that in or about November 1977 he applied for financing through RIHMFC for the construction of forty-two units of subsidized family housing; (2) that he submitted building plans to the building inspector, proposing to construct the building, applied for a building permit, and the inspector refused to act upon it; (3) that he appeared before the city council at its hearing on the ordinance on May 10 and presented evidence of his expenditures for land, preparatory work, and studies in excess of $80,000; (4) that the ordinance was passed over his objections, and he notified the council that the ordinance was illegal and would cause him damages; (5) that it was admitted at the hearings before the city council that the express purpose of the ordinance was to defeat his proposed use of the land; and (6) that the amendment was illegal in that it was not adopted pursuant to a comprehensive plan. Mesolella asked for damages in the sum of $2 million "for actual and as punitive damages for [the city's] intentional, malicious and capricious acts * * * in denying [him] the use of his lands and property in the circumstances of this cause * * *."

It is a familiar rule in this jurisdiction that in considering the sufficiency of a complaint,

"no complaint will be deemed insufficient unless it is clear beyond a reasonable doubt that the plaintiff will be unable to prove his right to relief * * * that is to say, unless it appears to a certainty that he will not be entitled to relief under any set of facts which might be proved in support of his claim.

"[V]agueness, lack of detail, conclusionary statements, or failure to state facts or ultimate facts, or facts sufficient to constitute a cause of action are no longer generally in and of themselves fatal defects." *Bragg v. Warwick Shoppers World, Inc.*, 102 R.I. 8, 12, 227 A.2d 582, 584 (1967).

Applying this liberal standard, we find Mesolella's complaint to state a claim for tortious interference with prospective contractual relations. Mesolella alleged the expectancy of a relationship with RIHMFC in the construction of his project; the council's awareness of that relationship in his allegation that he appeared before it, presented evidence of his preparatory work and studies, and warned it of the damage its action would cause him; intentional and improper interference in his allegation that the amendment was illegal and passed directly to stop his project; causation, in his allegation that the city's action denied him the proposed use of his property; and damages.

In declaring the amendment null and void in the earlier litigation, the trial court clearly found a known expectancy unjustifiably interfered with in its conclusion that the ordinance was passed directly to prevent the project.[10] This court relied upon

10. Transcripts of the meetings of the council committee on ordinances that took place on May 10 and June 12, 1978, which were part of the record before the court, clearly showed that committee members were aware of Mesolella's plans and of his negotiations with RIHMFC. The agreed statement of facts noted that application had been made to RIHMFC; the damages stipulated to in that statement included fees

paid to RIHMFC of $500 for the application and $4,000 for costs analysis; that list of damages was identical to the one presented to the committee on ordinances on May 10, 1978 save for the item for cost analysis. Thus it is safe to conclude that the trial justice's finding that the ordinance was passed to block Mesolella's "project" implied the city's awareness of Meso-

that finding in affirming the judgment. *Mesolella,* 439 A.2d at 1375.

Courts differ in the standards they set for proof of causation in this tort. Generally, they require proof either that but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established. *See* Annot., 5 A.L.R.4th at 17. We find the higher standard to have been met here.

The special master found that the city's failure to issue a building permit to Mesolella caused the breakdown of the financing arrangements with RIHMFC, a finding clearly supported by the testimony of Mesolella's witnesses. The director of RIHMFC testified that all was in order except for the permit, HUD having approved the agreement on February 23, 1978; that failure to issue the permit canceled the closing; and that the corporation would not finance the project while litigation was in progress. Mesolella's son testified that he was "ready, willing, and able" to proceed with the project and but for the denial of the permit he would have done so. Plans and specifications were complete, and although a final contract had not been signed with Homar Construction Company, the contemplated contractor, they had an agreement that they were ready to execute for the amount of the "hard costs." The representative of the syndicating company testified that an agreement was in place for syndicating the project and that the company was "ready, willing, and able" to complete the syndication had the financing gone through. Given the advanced state of readiness testified to by these witnesses, it seems clear that but for the interference by the city, the closing would have taken place and construction would have begun.

The master also specifically found, again clearly supported by the testimony, that at the end of the litigation for which the city was responsible, increased costs and the unavailability of section–8 funds rendered the financing agreement useless and the proposed construction impossible. Thus, Mesolella could not have mitigated his damages by resuming his plans. The changes in costs and availability of funding were reasonably foreseeable by the city in light of the rapidly fluctuating economy at the time this project was under construction and cannot therefore be considered an intervening cause of Mesolella's harm. *Cf. Almeida v. Town of North Providence,* 468 A.2d 915 (R.I.1983).

Lastly, the damages claimed by Mesolella and awarded by the master were appropriate to this tort. According to Restatement (Second) *Torts,* § 774A at 55 (1979), damages for such tortious behavior include (1) the pecuniary loss of the benefits of the prospective relation and (2) consequential losses for which the interference is a legal cause. *Cf. Smith Development Corp.,* 112 R.I. at 214, 308 A.2d at 483 (loss of prospective profits, if properly established, constitutes an appropriate basis for an award of damages in action for tortious interference with contractual relations).

The claim and award of damages for equity in the property, if developed, for damages for return of equity on the property, and for expenses constitute the pecuniary loss of the benefits of Mesolella's relation with RIHMFC; the claim and award of damages for the potential syndication fee constitute consequential losses. The master specifically noted that certain expenses that had been listed by Mesolella could not be considered damages resulting from "defendants' unwarranted interference with plaintiffs' project," for they would have been included in the mortgage and recovered as contributions to the equity he would receive.[11] He reduced the damages in this category accordingly. The special master's calculations were not chal-

lella's relations with RIHMFC at the time it interfered with his plans.

11. This is but one of many times that the master referred to the conduct of the city as tortious in this way.

**672**

lenged by the city before they were confirmed by the Superior Court.

■ We therefore hold that Mesolella's action sounded in tort. We further hold that § 9–31–3 applies to limit Mesolella's award to $50,000 but specifically note that we confine our holding to the circumstances of this particular case. We are aware that according to *Calhoun*, 120 R.I. at 629–30, 390 A.2d at 356, certain governmental functions were not meant to be the subject of tort claims, legislative activity perhaps being one of them. *See Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Furthermore, the actions of a city council in amending an ordinance are purely legislative. *Mesolella*, 439 A.2d at 1373 n.1. However, the city's failure to raise the issue of legislative immunity in the Superior Court forecloses our consideration of it now. *Scully v. Matarese*, 422 A.2d at 741. The city argued only that its liability should be limited to $50,000. We therefore shall not address the impact, if any, of the doctrine of legislative immunity.

### III

Our conclusion that the present action sounded in tort and that § 9–31–3 applies to limit the liability of the city to $50,000 resolves the question of prejudgment interest. In *Andrade v. State*, 448 A.2d 1293, 1295 (R.I.1982), we held that § 9–21–10, the prejudgment-interest statute applicable to tort actions, does not apply to judgments based on the State Tort Claims Act. We therefore hold that the trial justice erred in confirming the special master's addition of prejudgment interest to Mesolella's award.

The defendants' appeal is granted in part and denied in part, the judgment appealed from is vacated, and the case is remanded to Superior Court for the entry of judgment that conforms to this opinion.

BEVILACQUA, C.J., did not participate.