Robert F. PAYNE

v.

K–D MANUFACTURING CO. et al.

No. 84–358–Appeal.

Supreme Court of Rhode Island.

Feb. 2, 1987.

Carol A. Keefe, D'Amico Connor & Hurst, Providence, Richard G. Gelineau, Warwick, for plaintiff.

Mark C. Hadden, Robert W. Lovegreen, Hinckley Allen Tobin & Silverstein, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is an employment-contract dispute that comes before us after a Superior Court jury awarded the plaintiff the sum of $95,000 in damages. The trial justice denied the defendant's motions for a directed verdict and a new trial. The defendant has appealed both denials, and the plaintiff has filed "a conditional cross-appeal." Hereafter we shall refer to the plaintiff as Payne, to the defendant as K–D, and to K–D's vice president of manufacturing, P.J. Carcara, as Carcara.

The record indicates that sometime in late September 1978, K–D placed a help-wanted advertisement in the Providence Journal. K–D is situated in Lancaster, Pennsylvania. K–D manufactures tools, and at the time of the trial in February 1984 it had as part of its corporate makeup thirteen subsidiaries. One subsidiary was Central Tool Company, which was and still is located on Wellington Avenue in Cranston. K–D's 1978 ad sought the services of an individual who would serve as the general manager of K–D's Cranston operation. Payne was one of several applicants. His initial interview took place in mid-October 1978 at the Cranston Hilton hotel, where he first met Carcara. A second meeting took place at Central Tool's plant, where he once again met Carcara and the then-present owner of Central Tool. At the conclusion of this meeting, Payne and Carcara traveled to Warwick and Green Airport, where K–D's private plane was waiting to transport them to K–D's corporate headquarters. The next day Payne was the object of several interviews with K–D's officials, including the director of employment relations. During this particular period, Payne and Carcara discussed the contents of a document prepared by Carcara entitled "Central Tool—Five Year Operational Plan." The plan, which spanned the years 1979 through 1983, envisioned several changes including the automation of Central Tool's production and accounting systems, a relocation of a portion of the subsidiary's operations in Puerto Rico, and a restructuring of the operation. According to Payne, Carcara made it clear that should Payne accept any offer made by K–D, he, Payne, would be responsible for the execution of the plan.

After Carcara had a telephone conversation with the employee-relations director, he offered Payne the position of general manager at Central Tool with an annual salary of $35,000 per year, plus various benefits including use of a company car, participation in K–D's pension plan, and six-month periodic reviews of his performance. Payne told Carcara that he would consider the offer. The next day Payne consulted with his employment counselor, who suggested that Payne accept the offer. Payne telephoned his acceptance to Carcara, who then informed Payne that he

would receive written confirmation of the agreement.

In due course, Payne received a letter dated November 10, 1978, from the employee-relations director confirming K–D's offer and Payne's acceptance. The letter also set forth the salary, mentioned the periodic reviews, and asked Payne to sign an enclosed copy of the employee-relations director's letter and return it to K–D's headquarters. Of particular significance to the litigant was the director's observation that everyone who had met Payne was "certain that we have made a good decision * * *. We are equally certain that you will find your relationship with K–D to be in your best interests over the coming years."

Payne responded to the director's letter with a November 13, 1978 written expression of appreciation and acceptance of the employment offer and of his expectation of a "long and prosperous affiliation with K–D Manufacturing Company."

Payne reported for duty as general manager of the Cranston facility on November 16, 1978. Unfortunately, shortly after the beginning of the new year 1979, Carcara came to Cranston and took Payne to lunch; on the way Payne's expectation of a lengthy and beneficial relationship with K–D was shattered. As they traveled toward the restaurant, Carcara informed Payne that there were to be "changes" and that one of the changes included a new general manager at Central Tool. Payne was also asked that once lunch was over, he not return to the plant.

The issue presented to the Superior Court jury for its determination was whether Payne, as he insisted, was the recipient of the five-year term of employment, or whether he was, as K–D argued, an employee-at-will who could be discharged at any time.

K–D's motion for a directed verdict was based on Rhode Island's version of the Statute of Frauds, specifically G.L.1956 (1969 Reenactment) § 9–1–4(5), which provides that no action shall be brought against any person upon any oral agreement that, by its terms, cannot be performed within a year of the making of the agreement. K–D, as it must, pleaded the statute as an affirmative defense. Payne countered by relying on the final portion of § 9–1–4, which permits enforcement of the promise in question if "the promise or agreement * * * or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized."

Many years ago in *Cunha v. Callery*, 29 R.I. 230, 69 A. 1001 (1908), this court embraced the view that unsigned writings referred to in a signed writing may be read together with the signed writing to establish the terms of the agreement and satisfy our statute of frauds. Within the past decade, the court has also pointed out the necessity that the signed document recognize "at least implicitly, that the terms of the agreement are correctly stated in the unsigned writing." *Kates v. Kirshenbaum*, 122 R.I. 486, 492, 409 A.2d 540, 544 (1979). (Citations omitted).

When K–D sought the directed verdict, the trial justice was confronted with conflicting testimony about what happened when Payne and Carcara discussed Payne's future with K–D. Payne had told the jury that after he had discussed the managerial plan with Carcara, "no question" remained in his mind that he had come aboard for a five-year period during which he would attempt to achieve the goals laid out in the plan. Carcara, on the other hand, insisted that the plan was merely a management tool that by no stretch of the imagination could be classified as a guarantee of five years of continued employment. The employee-relations director was part of the management group that met and conferred with Payne at K–D's headquarters in the fall of 1978, and there is no question that when he forwarded the letter confirming Payne's appointment, he did indeed express no doubt that Payne's relationship with K–D would be in his "best interests over the coming years."

■ In moving for a directed verdict, K–D is in the same position as the employer in *Powless v. Pawtucket Screw Co.,* 116 R.I. 158, 352 A.2d 643 (1976), who had, like K–D, relied upon the statutory bar of § 9–1–4(5). There we emphasized, as we have many times, that a trial justice, in considering such a motion, is required, as is this court, to view the evidence and the inferences of which the evidence is reasonably susceptible in the light most favorable to the plaintiff employee, drawing only those inferences that support the plaintiff's claim. Neither credibility nor weight of evidence is to be considered at this juncture of the trial. When the evidence is so viewed, a reasonable inference may be drawn that K–D had committed itself to employing Payne for the five-year term.

■ Having in mind the posture of the case, the trial justice was justified in construing the employee-relations director's allusion to "coming years" to be an assurance that Payne was to be part of K–D's management team for at least five years. The director's letter, in our opinion, was a sufficient writing that would and did remove this dispute from the bar set forth in subsection 5 of our statute of frauds.

However, recently in *Pisaturo v. Raso,* 507 A.2d 1357 (R.I.1986), we once again emphasized that a trial justice, in considering a motion for a new trial, must pass upon the weight and credibility of the evidence and, in the process, accept or reject conflicting testimony as if he were sitting as a trier of fact. Once this sifting process is complete, the trial justice must then decide whether to approve the verdict even though entertaining doubts as to the correctness of the verdict either because the evidence is so evenly balanced or because different minds could come to different conclusions. If the trial justice is of the belief that the jury's verdict is against the weight of the evidence, he or she is compelled to grant a new trial. A trial justice, in proceeding in this area, need not make a comprehensive evaluation of the evidence. Nevertheless, reference should be made with some specificity to the particular facts that motivated the trial justice's decision, in order that this court may determine the appropriateness of the action. A decision made after making the foregoing analysis will be overturned on appeal only if the trial justice has overlooked or misconceived material evidence or is otherwise clearly wrong.

The question of whether sufficient evidence existed to permit the jury to determine the nature of Payne's employment relationship with K–D is far different from the issue of whether the jury's verdict was against the weight of the evidence.

■ Here the trial justice's analysis of the testimony is set forth in one paragraph. Carcara is described as an officer of the corporation who was engaged in the negotiations with and the employment of Payne. Portions of Payne's testimony about his shock at being dismissed and his belief that he had a five-year-employment contract in which he would only be dismissed for good cause were alluded to. In considering Carcara's testimony, the trial justice referred to the vice president's conversations with Payne concerning Payne's future with the corporation, the availability of a car, the long-time fringe benefits, and the absence of any discussion relative to a specific offer of a five-year-employment contract. Notice was also taken of Carcara's testimony in which he expressly stated that he was not dissatisfied with Payne's performance but that Payne's continued employment was the sole prerogative of K–D's top management. The trial justice said that the record and the testimony of the parties presented the jury with the issue of the existence or nonexistence of a five-year contract, and in the trial justice's words, such an issue was one upon which reasonable minds could differ. However, he has failed to point out to us what specific evidence he relied on in denying K–D's new-trial motion, and in the process, he has, in our opinion, overlooked or misconceived pertinent evidence.

A careful examination of Payne's testimony reveals that he "assumed a five-year contract" because of the employee-relations director's use of the phrase "coming years." At one point in his direct testimony Payne was asked by his attorney, when the director used the phrase "over the coming years" whether Payne "assumed" it was for the five years referred to in the operational plan. His reply was "Exactly." Subsequently, in cross-examination, Payne acknowledged that there was no specific reference in the director's November 10, 1978 letter to a five-year term of employment. Payne also agreed that in his reply to the director's letter, he inquired about the various fringe benefits, as well as the corporate pension plan, but failed to make any inquiry as to his job security. Later, in cross-examination, he conceded that during the three-tier interviewing process, not one mention was made of a five-year commitment on the part of the employer. K–D's counsel then confronted Payne with a deposition he had given three years prior to trial in which he admitted that "he could not say that Carcara had offered him a guarantee of five years' work with his employer." As the cross-examination concluded, Payne said that he had never informed Carcara of his desire for a five-year stint "because I felt it was an understanding between the two of us."

Carcara testified as an adverse witness even though he had terminated his relationship with K–D some four years earlier and was presently the executive vice president of a Pennsylvania business entity that specialized in the manufacture of custom plastic molds. He testified that Payne had been his first choice for the managership vacancy in Cranston. He also acknowledged that he was of the belief that Payne's termination was not justified; however, he acknowledged that the termination decision was one to be made by upper management and that in delivering the bad news to Payne, he was simply obeying a mandate from K–D's executive suite. No one, he said, had any written contract for a definite term at K–D with the exception of the president. He emphasized that the five-year management plan was solely for the benefit of K–D because it was a device that enabled the corporate executives to keep a constant eye on the economic progress of each of the subsidiaries.

It is our belief that the evidence in this case clearly preponderates against the jury's award. Payne's feelings, assumptions, or beliefs do not form the requisite basis for the award given by the jury.[1] Here, nobody disputes Carcara's assertion that the five-year operational plan was a device for measuring the subsidiary's economic growth, or lack of growth, and that the document was not concerned in any manner, shape, or fashion with the extent or length of Payne's stay in Cranston. Payne's understanding or hopes for a five-year contract fall far short of supporting a reasonable conclusion that the parties said they had indeed agreed to such an arrangement.

█ In this jurisdiction when the duration of a contract is uncertain, the contract is to be considered terminable at will. *Bader v. Alpine Ski Shops, Inc.*, 505 A.2d 1162, 1166 (R.I.1986); *School Committee of Providence v. Board of Regents for Education*, 112 R.I. 288, 291, 308 A.2d 788, 790 (1973). This principle applies even in situations in which the agreement of services provides that the employee shall receive a fixed sum for a stated period of service. *Dudzik v. Leesona Corp.*, 473 A.2d 762, 766 (R.I.1984).

█ A final comment on Payne's cross-appeal relates to the denial of his request that the jury be told that it could find an

1. The $95,000 award indicates the jury found there was a five-year employment contract. During deliberations, the jury requested information on the earnings Payne had gained since leaving the Cranston plant. When one takes the amount Payne would have earned with a five-year contract at $35,000 a year and deducts Payne's actual earnings from other sources during those years, the result comes within $100 of the $95,000 award.

employment contract for a period of less than five years. We have, on innumerable occasions, observed that the charge given to the jury must be applicable to the facts that have been adduced in evidence and that a request for instructions should be denied when there is no basis for such instruction in the evidence. *Brodeur v. Desrosiers*, 505 A.2d 418, 423 (R.I.1986). The evidence produced at trial presented an either/or situation: either Payne had a five-year employment contract or he was an employee-at-will. The request sought by Payne lacked any evidence that would support the request embodied in the instruction.

K–D's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court for a new trial. The plaintiff's contingent appeal is denied and dismissed.