Alan ROY

v.

**WOONSOCKET INSTITUTION FOR SAVINGS et al.**

**No. 85–107–Appeal.**

Supreme Court of Rhode Island.

May 26, 1987.

---

Milton Stanzler, Jonathan L. Stanzler, Abedon, Michaelson, Stanzler & Biener, Providence, for plaintiff.

John Blish, William Landry, Blish & Cavanaugh, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is a breach-of-employment contract dispute in which a Superior Court jury awarded the plaintiff, Alan Roy (Roy), the sum of $70,000 in damages. After the jury returned its verdict, the trial justice granted the motion of the defendants, Woonsocket Institution for Savings (the bank) and William LoSasso (LoSasso), for a directed verdict as well as their conditional motion for a new trial. Roy now appeals.

The record indicates that Roy began his employment with the bank in 1965 as a management trainee. Roy progressed through the ranks at the bank and eventually was elected a vice president in 1977. That same year he was placed in charge of the installation of an in-house data-processing system, a project that had a completion date of between five to seven years. In 1979 LoSasso was hired by the bank, becoming Roy's immediate superior.

In the early part of 1980 the bank's management personnel discussed the in-house data-processing system. Some members of the bank's management, including Roy, favored retention of the system that the bank had already begun to install. Others, including LoSasso, urged a switch to a less costly, simpler system. On March 28, 1980, the two competing viewpoints were presented to the bank's senior management. On April 4, 1980, the president of the bank announced that a decision had been made to switch to the less costly system endorsed by LoSasso. Just prior to the formal announcement, Roy had gone to the president's office and, in the presence of LoSasso, urged retention of the present system. However, the president advised Roy that the decision to switch systems was "irreversible."

The decision to switch systems apparently did not sit well with several employees of the bank. LoSasso testified that he personally observed a "general non-working situation" in the data-processing department after the president's announcement, and he also received a report that the data-processing department was in a "near mutinous condition."

The following Monday, April 7, 1980, Roy again appealed directly to the president and urged retention of the present system. The following day LoSasso confronted Roy with what LoSasso had observed and what had been reported to him, as well as Roy's further overture to the president. LoSasso testified that at the confrontation, Roy began to mutter to himself and became irrational. In response to Roy's behavior, LoSasso testified that he suggested to Roy that he resign. LoSasso further told the jury that Roy became angry at this suggestion and vowed that LoSasso would have to fire him. On April 10, 1980, LoSasso recommended to the president that Roy be discharged. The president agreed with LoSasso's recommendation, and Roy's employment was terminated that day.

Roy's version of his discussion with LoSasso on April 8 differed markedly from LoSasso's. Roy testified that LoSasso was "damned mad" that Roy had had further contact with the president regarding the systems switch. LoSasso suggested, Roy testified, that Roy recommend the termination of two data-processors and that by so doing Roy would "come out of this smelling like a rose." According to Roy, when he refused to fire the two employees, LoSasso became angrier and suggested that Roy submit his resignation. Roy responded by stating that he would submit his resignation only to the president.

Once his career at the bank had ended, Roy instituted this litigation, alleging that he had a contract for a definite term of employment that had been breached when he was fired without just cause. Roy also asserts that he was terminated because of LoSasso's tortious interference with his contractual relationship with the bank.

At trial the bank and LoSasso moved for a directed verdict pursuant to Rule 50(a) of the Superior Court Rules of Civil Procedure, both at the close of Roy's case and at the close of all of the evidence, the trial justice reserving decision thereon. The jury returned a verdict for Roy finding on special interrogatories: (1) that Roy had a contract of employment with the bank for a definite term extending beyond April 10, 1980, (2) that the bank did not have cause to discharge Roy, as it did on April 10, 1980, and (3) that LoSasso had tortiously interfered with Roy's contract of employment with the bank. The jury assessed compensatory damages against the bank in the amount of $30,000 and against LoSasso in the amount of $40,000. After the jury was discharged, the trial justice granted the reserved motion for a directed verdict. Thereafter the bank's and LoSasso's conditional motion for a new trial was also granted by the trial justice.

█ ) The validity of Roy's claim that the bank breached his employment contract depends entirely on Roy's ability to establish that he was contractually entitled to continued employment with the bank for a definite term beyond April 10, 1980. This requirement is imposed by the firmly established rule in Rhode Island that a contract to render personal services to another for an indefinite term is terminable at the will of either party at any time for any reason or for no reason at all. *Payne v. K–D Manufacturing Co.*, 520 A.2d 569 (R.I. 1987); *Dudzik v. Leesona Corp.*, 473 A.2d 762 (R.I.1984); *Powless v. Pawtucket Screw Co.*, 116 R.I. 158, 352 A.2d 643 (1976).

Roy argues that a contract for a definite term is established by (1) his election as a corporate officer, (2) the expression of his salary in an annual amount, and (3) the provisions in the bank's employee handbook and written personnel policies.

Roy places great weight on the fact that he was elected a corporate officer of the bank "for the ensuing year" at the annual meeting of the corporators in January of 1980. Roy also emphasizes that it was the practice of the chairman of the bank's board of trustees, after each and every election, to congratulate the officers for having "made it for another year" and that the occasion would be marked by the officers swearing to "uphold the law."

█ General Laws 1956 (1982 Reenactment) § 19–2–13, part of the statutory scheme regulating banks and trust companies, provides:

*"The president, vice-president, clerk or secretary and the trustees shall be elected at its annual meeting. The board of investment and other officers shall be appointed by the trustees and shall hold office during their pleasure.* The trustees shall have the general management and control of such corporation, and of its property; may, unless otherwise directed by the corporators, appoint employees, clerks and agents to retain office during their pleasure, and may delegate to the president or other officers, whether elected by them or by the corporators, the employment of clerks, agents, and employees as they deem proper; and may fill vacancies occurring during the year until the next annual meeting. If a person elected or appointed does not, within thirty (30) days there-

after, take the oath, his office shall thereupon become vacant." (Emphasis added.)

The clear implication of this statute is that bank officers, although elected annually, are "at will" employees. The federal legislation governing national banks, which contains language similar to the Rhode Island statute, has been construed precisely to the same effect.[1] *See Mahoney v. Crocker National Bank,* 571 F.Supp. 287, 289 (N.D. Cal.1983)("[b]y virtue of this provision of the National Banking Act, a board of directors may dismiss an officer prior to the expiration of his or her term * * * without incurring liability for breach of contract or wrongful discharge"); *see also Rohde v. First Deposit National Bank,* 127 N.H. 107, 497 A.2d 1214 (1985)

Roy's reliance on his receipt of an "annual" salary is totally irrelevant. This court has consistently ruled that a promise to render personal services to another for an indefinite term is terminable at the will of either party "even where the agreement of service provided that the employee would receive a fixed sum for a stated period of service." *Dudzik v. Leesona Corp.,* 473 A.2d at 766 (quoting *School Committee of Providence v. Board of Regents for Education,* 112 R.I. 288, 291, 308 A.2d 788, 790 (1973)); *see also Booth v. National India Rubber Co.,* 19 R.I. 646, 36 A. 714 (1897).

Roy's final contention is that the bank's operations manual and employee handbook created a jury issue about whether Roy had a contract of employment with the bank for a definite term. In support thereof Roy urges this court to adopt the emerging case law that recognizes that handbooks and personnel policies may give rise to contract rights in certain circumstances. *See, e.g., Leikvold v. Valley View Community Hospital,* 141 Ariz. 544, 688 P.2d 170 (1984); *Woolley v. Hoffmann-La Roche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985).

■ We need not address whether this doctrine should be adopted in this jurisdiction because Roy has failed to point out any provision in the bank's operations manual or employee handbook that could give rise to a reasonable belief that Roy's status at the bank was something other than at-will employee.[2] Moreover, the bank's handbook and manual specifically provided that the policies stated therein could be altered or revoked by the bank at any time and for any reason.[3] Thus it cannot be said that Roy should have relied on any statements in the bank's handbook or manual. As stated succinctly by the Michigan Court of Appeals, "[I]f an employer notifies its employees that its policies are subject to unilateral change, the employees can have no legitimate expectation that any particular policy will remain in force." *Dudkin v. Michigan Civil Service Commission,* 127 Mich.App. 397, 407, 339 N.W. 2d 190, 195 (1983).

■ The next issue to be resolved is whether the evidence warranted the jury's conclusion that LoSasso tortiously interfered with Roy's contract of employment.

1. 12 U.S.C.A. § 24 (1945) provides, in relevant part:

 "[A] national banking association * * * shall have power—

 \* \* \*, \* \* \*

 Fifth. To elect or appoint directors, and by its board of directors to appoint a president, vice president, cashier, and other officers, define their duties, require bonds of them and fix the penalty thereof, *dismiss such officers or any of them at pleasure,* and appoint others to fill their places." (Emphasis added.)

2. Roy points only to that section of the bank's personnel code that provides that no vacation pay will be given to an employee who is discharged for cause. Because he received vacation pay upon his termination from the bank, Roy argues that this operates as an admission by the bank that Roy was terminated without cause. Even assuming we follow Roy's logic, the question whether Roy was terminated without good cause is simply irrelevant once it is concluded that Roy was an at-will employee and, as such, could be terminated for any reason.

3. The introductory comments on the first page of the bank's employee handbook includes the statement "[T]he programs and policies described here are subject to change at the discretion of the Bank." Similarly, statements substantially similar to the following appear repeatedly throughout the operations manual: "The Bank reserves the right to modify or discontinue this policy at any time for any reason it shall consider sufficient."

Although not so characterized by Roy, his claim against LoSasso is more properly described as a claim of tortious interference with prospective contractual relations.[4]

This court recognized the existence of such a tort in *Federal Auto Body Works, Inc. v. Aetna Casualty & Surety Co.*, 447 A.2d 377 (R.I.1982), and described more fully the particular elements required to maintain the cause of action in *Mesolella v. City of Providence*, 508 A.2d 661 (R.I. 1986). In *Mesolella* we noted that

> "[t]he particular elements of the tort include (1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff. * * * Malice, in the sense of spite or ill will, is not required; rather legal malice—an intent to do harm without justification—will suffice." *Id.* at 669–70.

A careful review of the trial record indicates that there was no evidence introduced that could lead one to conclude that LoSasso acted with legal malice when he recommended that Roy's employment with the bank be terminated. LoSasso testified that his decision to recommend Roy's termination stemmed solely from Roy's "failure to support a management decision." Moreover, Roy admitted at trial that there was no "personal animosity" involved in his termination and that no one at the bank was "out to get him."

Although in ruling on the motion for a directed verdict the trial justice must examine the evidence in the light most favorable to Roy and draw all reasonable inferences therefrom, *Lamoureux v. Davis*, 504 A.2d 449, 451 (R.I.1986), the trial justice is also under the concomitant duty to grant the motion if the evidence is insufficient in law to support a verdict in Roy's favor. *Marshall v. Tomaselli*, 118 R.I. 190, 195, 372 A.2d 1280, 1283 (1977). Relying on the foregoing analysis of the evidence, it is our belief that the trial justice did not err when he granted defendants' motion for a directed verdict.

Since it is our belief that the grant of the directed verdict was correct, we need not consider the correctness of the trial justice's grant of a conditional motion for a new trial.

The plaintiff's appeal is denied and dismissed, and the judgment appealed from is affirmed.

---

4. "One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them." Restatement (Second) *Torts* § 766 at 11 (1979).