**Stephen T. DAY, Plaintiff,**

**v.**

**CITY OF PROVIDENCE; Mayor David N. Cicilline, in his official capacity as the Mayor of Providence; James F. Rattigan, in his official capacity as Chief of the Providence Fire Department; Stephen Napolitano, in his official capacity as Treasurer of the City of Providence; Sybil Bailey, in her official capacity as Director of Personnel for the City of Providence, Defendants.**

No. C.A. 03–178S.

United States District Court,
D. Rhode Island.

Oct. 4, 2004.

**312**

Walter R. Stone, Esq., Adler Pollock & Sheeran, Providence, RI, for Plaintiff.

Kenneth B. Chiavarini, Esq., Sara A. Rapport, Esq., City of Providence, Law Department, Providence, RI, for Defendants.

## DECISION AND ORDER

SMITH, District Judge.

When the new Mayor of the City of Providence decided to cut payroll costs, one of the positions he selected for elimination was the Superintendent of Automotive Maintenance Division. Stephen Day, a politically active former head of the Providence Firefighters Union, held that

position, and was terminated. Mr. Day, the Plaintiff in this action, believed the elimination of his position was not about saving money, but was directly related to his political and other First Amendment-protected activity. The City contends Day was terminated to save money, and his outside activities had no bearing on the elimination of his position.

Plaintiff Day brings this action claiming violations of federal constitutional and state tort law against Defendants the City of Providence (the "City") and various City officials.[1] Defendants move for summary judgment on all claims. For the following reasons, the motion is granted on all Counts.

### I. *Facts*

The following facts are undisputed unless otherwise noted.[2] Plaintiff had been employed by the Department since 1980. At the time of the filing of the Complaint, Plaintiff was the fifth ranking Deputy Chief in seniority out of twenty-five Chiefs or Deputy Chiefs in the Department. There is a factual dispute, however, about whether Plaintiff actually held a "rank" within the meaning of the Providence Fire Department Rules and Regulations (the "Rules and Regulations") or whether he simply held an unranked position with pay and status equal to a Deputy Chief. (*See* Pl.Ex. 5; Def. Ex. 1 (introduced at hearing on Motion for Preliminary Injunction).) For purposes of this motion, it is assumed that Day held the "rank" of Deputy Chief under the Rules and Regulations, as he contends.

---

1. Plaintiff sought a preliminary injunction, which this Court denied, on May 28, 2003. The Court heard oral argument on Defendants' Motion for Summary Judgment on March 2, 2004.

2. To the extent facts are disputed, they are not material; in any event, the Court will assume for purposes of this Decision that Plaintiff's assertion is correct.

Plaintiff's official title was Superintendent of the Automotive Maintenance Division (the "Division") of the Department and there is no dispute that he was a Deputy Chief of the Department. His primary duties included the maintenance and operation of a repair and machine shop for the Department's equipment. He had been promoted to this position on July 25, 1996, from the rank of Firefighter, First Class. Day never held the intermediate ranks of Lieutenant, Captain, or Battalion Chief before moving from Firefighter, First Class, to Deputy Chief of the Department. Day had two subordinates in the Division: Henry Cochrane, the Assistant Superintendent of the Division, and George Lazzareschi, Jr., who is an experienced mechanic and himself supervises eight other mechanics within the Division.

Day received a termination notice on May 1, 2003. He was informed by Defendant James F. Rattigan, the then-Chief of the Department, that the City planned to eliminate his position (along with five others, including that occupied by Cochrane) for fiscal year 2004. Cochrane, however, was offered and accepted the position of Battalion Chief of Battalion No. 2, Group D, in the fire suppression unit. Defendants claim that Cochrane, and not Plaintiff, was offered this position because of his prior training, and it is undisputed that Cochrane had previously achieved the ranks of Lieutenant and Captain in the Department and had experience and training in fire suppression. Plaintiff concedes that he possessed none of these qualifications.

Nevertheless, Plaintiff believes that the real reasons for his termination are to be found elsewhere. He claims that he had

been active politically in Providence and that he supported then-candidate Joseph Paolino in his mayoral campaign against current Providence Mayor David Cicilline.[3] (Compl.¶¶ 12, 13.) He alleges that he had emceed three or four radio talk shows devoted to Paolino's campaign. He also claims that he has created an organization called the "Providence Chiefs' Association" and is in the process of attempting to organize the Fire Chiefs in the Department for the purpose of collective bargaining. (*Id.* at 14.)

Plaintiff argues that his opposition to the election of Mayor Cicilline, his well-known past support for former Mayor Cianci, and his labor-related activities are all protected free speech and association under the First Amendment. He alleges that Defendants violated his rights by terminating him because of those activities. Plaintiff also asserts that he was terminated in violation of the Providence City Charter (the "Charter"), which, he claims, controls the procedures for his termination. He points to various Charter provisions purportedly indicating that: (1) only the Mayor himself had the power to terminate him; (2) he is exempt from termination for cause; (3) he has the right to set up a collective bargaining arrangement; and (4) the City is prohibited from discriminating or threatening to discriminate against him on any political basis.

From this combination of facts and claims, Plaintiff constructs a Complaint with the following causes of action: (1) wrongful termination; (2) violation of his First Amendment rights; (3) violation of his Fourteenth Amendment rights to procedural due process; and (4) violation of

---

**3.** Paolino and Cicilline sought the Mayor's office after former Mayor Vincent A. "Buddy" Cianci, Jr., was convicted of racketeering con-

spiracy and sentenced to prison, causing him to resign from office.

the Rhode Island Civil Rights Act, R.I. Gen. Laws § 42–112–1, *et seq.*[4] He seeks compensatory damages, an injunction against Defendants from hiring anyone for his former job, and reinstatement. Defendants move for summary judgment on all counts.

## II. *Standard of Review*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When a motion for summary judgment is directed against a party that bears the burden of proof, the movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that showing is made, the nonmovant then bears the burden of producing definite, competent evidence to rebut the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great Atl. & Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir. 1989). In other words, the nonmovant is required to establish that there is sufficient evidence to enable a jury to find in its favor. *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997).

## III. *Analysis*

### A. *First Amendment Political Discrimination*

 Plaintiff alleges that he was terminated in violation of his political, associational and free speech rights under the First Amendment to the U.S. Constitution. The First Circuit has set forth the following praxis for such cases:

> In *Mt. Healthy City School District Board of Ed. v. Doyle,* [429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)], the Court established a two-part burden-shifting analysis for evaluating free speech claims, which has also been applied in the political discrimination context. First, the plaintiff must show that she engaged in constitutionally protected conduct, and that this conduct was a substantial or motivating factor for the adverse employment decision. If she does so, then the defendant is given the opportunity to establish that it would have taken the same action regardless of the plaintiff's political beliefs—commonly referred to as the *Mt. Healthy* defense.

*Padilla–Garcia v. Guillermo Rodriguez,* 212 F.3d 69, 74 (1st Cir.2000) (internal citations omitted). In order to make out a prima facie case sufficient to withstand summary judgment review, Plaintiff must "point to evidence in the record that would 'permit a rational factfinder to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus.'" *Lopez–Carrasquillo v. Rubianes,* 230 F.3d 409, 413 (1st Cir.2000) (citing *Padilla–Garcia,* 212 F.3d at 74).

Plaintiff's prima facie evidence of political discrimination consists of the following: (1) Day was known to have been a supporter of former Mayor Cianci; and (2) Day

---

**4.** Plaintiff agreed to dismiss Count IV volun- tarily at the preliminary injunction hearing.

supported Mayor Cicilline's opponent, Paolino, in the 2002 mayoral election, and spoke publicly on three or four radio programs expressing his political views.[5] In addition, at the hearing on his application for a preliminary injunction, Day testified as to the following exchange between himself and James Taylor, a Captain in the Department:

> [Mayor Cicilline] asked other people could he get me, could he eliminate my job in January of this year, based on those kinds of reports to me. Not the superficial, maybe, contact that I had with him, but the fact that he asked an individual fire fighter, who worked hard for him in the campaign, can I eliminate that guy; is he in the Union?

(Tr. of Prelim. Inj. Hr'g at 55.)

 Assuming that Plaintiff's activities are constitutionally protected, he has nevertheless failed to connect them in any meaningful way to his termination; he therefore cannot show that his political speech or association was a substantial or motivating factor underlying his termination. First, his connection to former Mayor Cianci, assuming it exists, is irrelevant. Former Mayor Cianci was never in political competition with Mayor Cicilline; there is therefore no conceivable connection between Plaintiff's termination and his support for Cianci. Second, there is no evidence that Mayor Cicilline or anyone else in a position of authority over Plaintiff knew about his handful of radio appearances on behalf of Paolino. Plaintiff simply assumes that Cicilline knew of his activities, was angered by them, and wanted to "get him" for supporting his opponent. He seems to assume that the Court will do so as well. But as the First Circuit has made clear, the mere fact that Plaintiff

was a supporter of Paolino, a candidate for elected office in competition with the eventual victor, is an insufficient nexus to assert a First Amendment violation. "Merely juxtaposing a protected characteristic— someone else's politics—with the fact that plaintiff was treated unfairly is not enough to state a constitutional claim." *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 58 (1st Cir.1990), *overruled on other grounds by Educadores Puertorriqueños en Accion v. Hernandez*, 367 F.3d 61 (1st Cir.2004). Rather, Plaintiff must produce some evidence from which a factfinder could conclude that the Defendants' motivation for terminating him relates to the exercise of his First Amendment rights. *See id.* Even if a "politically charged atmosphere" existed between the parties (and there is no evidence that such was the case here), this, "without more, provide[s] no basis for a reasonable inference that defendants' employment decisions about *plaintiff* were tainted by their disregard of *plaintiff's* first amendment rights." *Id.* (emphasis in original).

 The strongest piece of evidence connecting Day's termination with his political beliefs is his testimony at the preliminary injunction hearing cited above, attributed by Day (through Taylor) to Mayor Cicilline. However, when pressed in his deposition about the veracity of the statement and its source, Day retreated. Initially, he conceded that the statement may not have related to Day's politics at all. Then he was not clear that the statement was attributable to the Mayor. Next, he recanted his testimony at the injunction hearing, admitting that the statement was never uttered by anyone. Day's final position, and the sum and substance of his First Amendment claim, was that he

---

5. Plaintiff also claims that at some point he "made a speech against Mayor Cicilline during the Democratic Primary" (Pl. Mem. Opp. Summ. J. at 11), but the record is bereft of any evidence that Plaintiff ever gave a public speech against the present Mayor.

gained from Taylor and other co-workers the general sense that he should "be careful or see if I could go to any of my political loopholes and try not to be fired." (Pl. Dep. at 97.) Likewise, Taylor testified that he never had a conversation with anyone (including Mayor Cicilline) about Day's political affiliations with, or views about, former Mayor Cianci, candidate Paolino, or Mayor Cicilline. (Taylor Dep. at 9–10.) "Without more, a non moving plaintiff-employee's unsupported and speculative assertions regarding political discrimination will not be enough to survive summary judgment." *Rivera–Cotto v. Rivera*, 38 F.3d 611, 614 (1st Cir.1994). Furthermore, whatever the content and source of the statements supporting Plaintiff's belief that his termination was politically motivated, it is undisputed that those statements are hearsay (double or triple hearsay at that); they therefore cannot be considered in assessing Plaintiff's prima facie case. *See Vazquez v. Lopez–Rosario*, 134 F.3d 28, 33 (1st Cir.1998) (affirming inadmissibility of "hallway gossip" in political discrimination case because "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment").

Day relies heavily on *Padilla–Garcia*, in which the plaintiff Padilla–Garcia was employed by a prior political administration in Puerto Rico, and was "commonly associated with [the former administration] and well known for participating in the primary campaign against [the new administration]," 212 F.3d at 73. When the new administration was elected, Padilla–Garcia assumed a role on the "transition committee," during which time she "experienced several incidents of humiliation and harassment which she attribute[d] to her role in the previous administration." *Id.* Shortly thereafter, she was informed that her position would be terminated, and she sued the Puerto Rican municipality and the new administration for, *inter alia*, violation of her First Amendment rights. *Id.*

The First Circuit reversed the district court's entry of summary judgment for the defendants. Crucial to the court's ruling was the substantial prima facie proffer made by the plaintiff:

> It was well known that Padilla–Garcia was tied to the [prior] administration and that she had campaigned in the primary election against [the present mayor]. Moreover, the record shows that "the primary election left serious conflict between the two defined groups...." This circumstantial evidence that the appellant was a "conspicuous target[ ]" could alone create an issue of fact on discriminatory animus. *See Acevedo–Diaz*, 1 F.3d at 69 (recognizing that highly charged political atmosphere "coupled with the fact that plaintiffs and defendants are of competing political persuasions" may be probative of discriminatory animus). However, it is further supported by the testimony of the appellant and [three] witnesses ... which reveal that from the beginning Padilla–Garcia was targeted for humiliation and harassment by the appellees because [the present mayor] perceived her as a political threat.

*Id.* at 75. Here, by contrast, there is no evidence of a charged political climate—indeed, it is undisputed that Mayor Cicilline not only retained employees of the former mayoral administration but also hired several individuals who were employed by and worked for candidate Paolino's campaign (unlike Plaintiff, who did not). Neither are there any witnesses supporting Day's claims, as there were in *Padilla–Garcia*. There is no concrete evidence, direct or circumstantial, that Mayor Cicilline was remotely interested in Day's political persuasions, let alone in humiliat-

ing, harassing, or firing Plaintiff because of his advocacy for, or association with, Paolino. In consequence, Plaintiff has failed to set forth a prima facie case of political discrimination in violation of the First Amendment. Summary judgment is appropriate on this claim.

### B. Procedural Due Process

■ Plaintiff also alleges that he has a property interest in continued employment with the Department, and that this interest was encroached upon because he was terminated without adequate procedural due process. He argues that the rules governing his termination and the process due are set forth in the Charter and the Rules and Regulations, and that Defendants did not adhere to their own established procedures when terminating him.

■ "A constitutionally protected property interest in continued public employment typically arises when the employee has a reasonable expectation that her employment will continue." Gomez v. Rivera Rodriguez, 344 F.3d 103, 111 (1st Cir. 2003). Defendants do not contest that Day has such a constitutionally protected interest; instead, Defendants contend that Day's due process claim is not viable because he was terminated pursuant to a municipal reorganization that necessitated job cuts. Defendants point to uncontradicted evidence in the record that Chief Rattigan's proposal to eliminate six positions in the Department was motivated by City-wide staff reductions in early 2003 and discussions with the City's Acting Chief of Administration, John C. Simmons, and members of the Public Finance Management Corporation.[6] (Tr. of Prelim. Inj. Hr'g at 55–56, 115–18.) Chief Rattigan testified that it was explained to him

during these discussions and meetings in early 2003 that the Department was "one of the most expensive departments of the city" and that downsizing would be required. (Id. at 118.) By eliminating five positions in the Department (two were consolidated into one position), Chief Rattigan testified that the City saved over $600,000. (Id. at 111.)

■ There is a well-established "reorganization exception" to the requirement that an employee receive a pre-termination hearing: "Where a reorganization or other cost-cutting measure results in dismissal of an employee no hearing is due." Duffy v. Sarault, 892 F.2d 139, 147 (1st Cir.1989); see also Hartman v. City of Providence, 636 F.Supp. 1395, 1410 (D.R.I.1986) (Selya, J.) ("Numerous federal and state courts have recognized that an employee who loses his or her job or who is furloughed is not entitled to a hearing, despite the presence of a 'no dismissal except for cause' rule, when the position is abolished pursuant to a bona fide government reorganization or kindred cost-cutting measure.").

However, if a purported municipal reorganization is merely a pretext for terminating an individual for other, discriminatory reasons, the reorganization exception is inapplicable. Hartman, 636 F.Supp. at 1416 ("[C]ourts cannot permit the exception to become a convenient ruse whereby a government agency, simply by affixing a label, can avoid the necessity for demonstrating 'cause' when it wishes to dismiss a particular employee."). Unsurprisingly, Day claims that the municipal reorganization was in reality a sham to mask the actual reason for his termination—the Mayor's displeasure with Plaintiff's political views. (Pl. Mem. Opp. Summ. J. at 14.)

---

**6.** Simmons himself worked for Paolino, the Mayor of Providence in the late 1980s and early 1990s, as Paolino's Director of Administration. (Simmons Dep. at 9.) Simmons was then hired by Mayor Cicilline in much the same role.

Day proffers four facts that he believes raise a genuine issue of material fact about whether the municipal organization was pretextual. None of them do. First, he complains that the employment decisions within the Department (including whom to terminate) were made solely by Chief Rattigan in his unbridled discretion. Day has not established, however, that such discretion (even if possessed by Rattigan) indicates that the reorganization was a sham; in fact, if Rattigan had sole discretion over whom to fire, Day's allegations that Mayor Cicilline terminated him on the basis of his political dispositions lose all force. Moreover, Chief Rattigan himself testified that during the entire process of determining which Department positions would be eliminated, Day's name was only mentioned once—at a meeting on April 14, 2003, attended by Rattigan and Simmons, among others—after Rattigan had already determined that the position of Superintendent of the Automotive Maintenance Division would be eliminated. (Rattigan Dep. at 41.) Rattigan further testified that Day's alleged political activities were never once mentioned at any of the meetings or discussions pertaining to the reorganization, and that he had no personal knowledge about Day's support of candidate Paolino or lack of support of Mayor Cicilline.[7] (*Id.* at 47–49.)

Second, Day alleges that "for all intents and purposes, Mr. Day was the only person to be terminated in the alleged reorganization." (Pl. Mem. Opp. Summ. J. at 14.) Plaintiff supports this claim by stating that five of the six individuals whose positions were eliminated were retiring (Day being the sixth). This is, in fact, not true. Ronald Johnson, the Department Superintendent of Carpentry, also was terminated when the Department eliminated his position. Although it is true that Rattigan knew that the individuals occupying three of the other four positions were retiring,[8] that is insufficient, of itself, to create a genuine issue of material fact supporting the contention that the entire municipal reorganization was initiated to target Plaintiff surreptitiously.

Third, Day attempts to establish pretext by pointing out that Henry Cochrane, Day's subordinate within his Division, was offered the position of Battalion Chief for Battalion No. 2 in the Department, while he was not. Defendants rightly point out, however, that Day was not qualified to assume this position, either by education or training: Day had never achieved the intermediate Department ranks of Lieutenant and Captain, nor had he any training in fire suppression. Day retorts that he was not offered any other employment in the Department, for example, as a Firefighter, First Class. But Day did not seek such employment and there is no indication from him that he would have accepted that position if it had been offered. Indeed, Day does not seek in his Complaint reinstatement as a Firefighter, First Class; he seeks the re-creation of his former job and reinstatement therein. (Compl.¶¶ 30, 34, 41, 54.)[9] In any event,

7. Rattigan also stated that he knew of Day's support for former Mayor Cianci (Rattigan Dep. at 48) but, as indicated earlier, that affiliation is irrelevant since Cicilline and Cianci were never political competitors.

8. The Department eliminated the positions of Administrative Assistant to the Chief, Department Safety Officer, and Director of Training.

The individuals occupying these positions retired in February and March 2003.

9. Day has not argued that he has a property interest in his "rank" within the meaning of the Rules and Regulations; he only claims that he has such an interest in his employment with the Department. He therefore has not asserted that it was a violation of his due process rights to be terminated without being

the fact that Plaintiff has not remained employed by the Department in any capacity is not probative of pretext.

Finally, Day argues that certain incidents in his past, which apparently involved alleged ethical transgressions and related charges filed against him by an undisclosed "pension board" (Pl. Mem. Opp. Summ. J. at 15) "may have been of concern to Defendants, creating an issue as to whether the proffered rationale for Mr. Day's termination was a mere pretext." (*Id.*) Plaintiff's evidentiary support for this contention is rooted exclusively in several questions asked by counsel for Defendants at Plaintiff's deposition. This will not do. Opposing counsel's deposition questions, however unpleasant, are not the stuff of constitutional deprivation, nor are they "evidence" of anything, let alone evidence which supports an inference that the reorganization was pretextual. Plaintiff's procedural due process claim fails.

### C. *Wrongful Termination*

■■■ Plaintiff lastly asserts a Rhode Island state law tort claim for wrongful termination. He claims that he was not terminated in conformity with the applicable provisions of the Charter. The Charter provides:

(b) *Fire department.* The head of the fire department shall be the commissioner [of public safety], who shall appoint a fire chief, who shall serve as the chief executive officer of the fire department subject to the direction of the commissioner. . . . The commissioner shall:

(1) have authority to appoint, remove, organize and control the officers and personnel of the fire department.

Providence City Charter § 1001(b)(1). The Charter also states that "[i]n the event of a vacancy in the office of commissioner, the mayor shall act as commissioner of public safety until a commissioner has been appointed and approved by the city council." *Id.* at § 1001. Day contends that since the position of commissioner was vacant at the time of his termination, the Charter permitted only Mayor Cicilline, not Chief Rattigan, to terminate Plaintiff. He argues that since Chief Rattigan had sole discretion to make job cuts within the Department, Plaintiff's termination violates the Charter. The Charter also provides that the commissioner must "promulgate all rules and regulations" to operate the Department, including rules for "removal . . . of members of the fire department." *Id.* at § 1001(b)(2). Plaintiff claims that there are no such rules that would govern his termination. Finally, Day points to a provision in the Rules and Regulations that establishes a system of job tenure consideration based on seniority and rank within the Department. He believes that he had obtained a high rank in the Department, within the meaning of the Rules and Regulations, but that this achievement was not taken into account in the decision to terminate him.

■■■ Day's arguments depend on whether someone in his position can sue for wrongful termination in Rhode Island. Plaintiff's employment in the Department, like that of the other Chiefs and Deputy Chiefs, is not covered by any collective

permitted the opportunity to "bump down" in rank. In the context of unionized employees, such arrangements are not uncommon during workforce reductions, *see, e.g., Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 566, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), but it is not at all clear that the same rights would apply to non-unionized employees and there is nothing in the operative City documents that would appear to support such a right. In any event, since neither party has briefed or raised this issue, this Court will not address it further.

bargaining agreement. Moreover, Day's position is not governed by a written contract of any kind. He is therefore an employee-at-will. It is well settled that Rhode Island law does not permit an at-will employee to bring a claim for wrongful termination. *Henderson v. Tucker, Anthony and RL Day,* 721 F.Supp. 24, 27 (D.R.I. 1989); *Brainard v. Imperial Mfg. Co.,* 571 F.Supp. 37, 40 (D.R.I.1983) ("The Rhode Island Courts have not recognized the right of at-will employees to sue for wrongful discharge."). Only one narrow exception to this rule has emerged over the years. In *Cummins v. EG & G Sealol, Inc.,* 690 F.Supp. 134 (D.R.I.1988), the court held that "under Rhode Island law an employee-at-will possesses a cause of action in tort against an employer who discharges the employee for reporting employer conduct that violates an express statutory standard," *id.* at 139.

■ Since the exception is unavailing,[10] Day seeks to circumvent this common law obstacle by arguing that the provisions in the Charter and Rules and Regulations together create an implied employment contract. At oral argument, counsel for Plaintiff urged the Court that the "totality of the circumstances" of this case—namely, the Charter and Rules and Regulations provisions that are purportedly inconsistent with Day's termination—warrant an exception to the general rule proscribing a cause of action for wrongful termination in the at-will context. (Tr. Mot. Summ. J. at 9–10.)

Rhode Island courts have been leery of implying employment contracts from manuals, handbooks, or any other extra-contractual sources. In *Roy v. Woonsocket Inst. for Savings,* 525 A.2d 915 (R.I.1987), the Rhode Island Supreme Court first confronted the argument that an employee manual and handbook created contractual rights. Although it ultimately declined to address that issue, the court stated:

> Roy has failed to point out any provision in the [employer's] operations manual or employee handbook that could give rise to a reasonable belief that Roy's status ... was something other than at-will employee. Moreover, the ... handbook and manual specifically provided that the policies stated therein could be altered or revoked by the [employer] at any time and for any reason. Thus it cannot be said that Roy should have relied on any statements in the [employer's] handbook or manual.

*Id.* at 918. The court reaffirmed its position in *DelSignore v. Providence Journal Co.,* 691 A.2d 1050 (R.I.1997), in which a former employee of the newspaper, who was a manager and non-union member not covered by a collective bargaining agreement, sued his employer for wrongful termination. The plaintiff argued, *inter alia,* that the defendant's employee manuals created an implied contract. The court rejected this contention: "With respect to the plaintiff's alternative, implied contract theory, he has not directed us to anything in the defendant's policies, practices, procedures, or employee memoranda that would give rise to a reasonable belief that he was anything other than an at-will employee." *Id.* at 1052.

---

**10.** Day rightly does not argue that the *Cummins* exception should apply here, since he does not allege that his termination implicates any question of retaliation for whistleblowing under state or federal law. Even this exception itself has never specifically been endorsed by the Rhode Island Supreme Court. It has certainly never been extended to other employment-at-will contexts. *See Dunfey v. Roger Williams Univ.,* 824 F.Supp. 18, 24 (D.Mass.1993) (in Rhode Island *"Cummins* remains the sole exception to th[e] long-standing rule" that wrongful discharge claims by at-will employees are not permitted).

Day contends that the Charter provisions allegedly establishing the procedure for his termination did create in him the type of expectation adverted to in *DelSignore*. This Court does not agree. The fact that the Charter allegedly vests the power of job termination with the commissioner (or the Mayor, in this circumstance) does not imply that Day has anything other than at-will employment. The Charter provisions that Day cites could not have given him any reasonable expectation of an implied contract. Even if one accepts that Rattigan had sole discretion to terminate Day and eliminate his position, and that such discretion was in contravention of the Charter, Day nevertheless is an at-will employee whose employment expectations would not reasonably have been altered by anything in the Charter.

Second, Day argues that the Rules and Regulations establish a system of rank and seniority that led to his reasonable expectation that he had obtained something other than at-will employment. Even assuming, however, that Day had achieved a certain rank within the meaning of the Rules and Regulations (about which there is a factual dispute), there is no provision in the Rules and Regulations that establishes a specific procedure to be followed in deciding whom to terminate, the order of termination, or which positions to eliminate. There is therefore nothing in the Rules and Regulations that would give rise to Day's reasonable belief that his at-will employment had changed to contract-based employment. This Court will not imply an employment contract in the face of the Rhode Island Supreme Court's long-standing reticence to do so in cases such as this. Neither the Charter nor the Rules and Regulations provides a remotely sufficient basis to expand the limited reach of Rhode Island's law of implied contract for at-will employees.

## IV. *Conclusion*

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED on all Counts.

IT IS SO ORDERED.